1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  SACRAMENTO E.D.M., INC., et al.,          No. 2:13-cv-0288-KJN

12              Plaintiffs,

13       v.                                   ORDER

14  HYNES AVIATION INDUSTRIES, et al.,

15              Defendants.

16

17          Plaintiffs Sacramento E.D.M., Inc. ("Sac EDM") and Dan Folk (collectively "plaintiffs")

18  bring this action asserting claims for breach of fiduciary duty, fraud, constructive fraud, and

19  tortious interference with contract against defendants Hynes Aviation Industries, Inc. ("HAI"),

20  Michael K. Hynes ("Hynes"), and Hynes Children TF Limited ("Hynes Children") (collectively

21  "defendants") based on various acts of alleged self-dealing defendants engaged in over the course

22  of the parties' business relationship between 2004 and 2012.[1]  Defendants HAI and Hynes filed

23  counterclaims against plaintiffs, alleging that plaintiffs breached their payment obligations under

24  a number of contracts that defendants allege the parties entered into over the course of their

25  business relationship.

26  _____

27  [1] Plaintiffs also assert claims for negligent and intentional interference with prospective business
    advantage, for which plaintiffs request dismissal in their post-trial briefing based on an admission
28  that insufficient evidence was presented at trial to support those claims.

                                              1

The court held a seven-day bench trial on the merits of the parties' claims and their respective entitlement to damages and other appropriate remedies, commencing on September 15, 2016, and concluding on November 14, 2016.[2]  After carefully considering the evidence offered at trial, the arguments of counsel, the parties' post-trial written submissions, and the controlling law on the issues presented, the court issues its findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52(a).  However, before the court provides such findings, the court finds it necessary to make several observations regarding the presentation of evidence during the trial more generally.

I.    Initial Observations and Comments Regarding the Presentation of Evidence

While the court acknowledges that it is somewhat unusual to provide an initial statement regarding its observations about the trial, the court finds that the peculiarities of this case call for such an account.  As the court repeatedly informed the parties over the course of the trial, the court is profoundly troubled by some of the evidence offered at trial, both in its content and in its presentation.  In particular, the court is shocked and dismayed by the testimony provided by Dan Folk and Hynes, the two principal witnesses the parties presented at trial.

With regard to Dan Folk, the court finds it difficult to reconcile the fact that he is regarded both by himself and the other parties and witnesses, including Hynes, as being talented and successful in his business endeavors, given his trial testimony and purported inability to recall, at times, even basic facts relating to his own business and his dealings with defendants.  Indeed, it is clear to the court from the testimony provided by other witnesses and the parties' Joint Exhibits admitted into evidence during trial that much of Dan Folk's claimed difficulty in recollecting the events at issue is largely attributable to his attempt to obfuscate certain facts that could be seen as damaging to plaintiffs' case, rather than a genuine inability to remember.  Accordingly, the court finds Dan Folk's testimony, as a general matter, to lack credibility.[3]

---

[2] The court conducted the bench trial on September 15, 2016, September 16, 2016, September 19, 2016, September 20, 2016, September 21, 2016, September 22, 2016, and November 14, 2016. (ECF Nos. 120, 121, 122, 123, 124, 125, 134.)

[3] While the court finds Dan Folk's testimony to generally lack credibility, this does not mean that the court finds everything he testified to during trial untrustworthy.  Accordingly, the court cites

With regard to Hynes, the court finds much of his testimony consists of little more than self-serving and self-aggrandizing statements made in an attempt to obscure and re-characterize his clearly self-interested conduct as having been carried out with plaintiffs' best business interests in mind. Such testimony is easily contradicted by other evidence offered at trial, including other statements Hynes provided during the course of his own testimony. The court finds it especially troubling that Hynes has advised multiple businesses over the years, including plaintiffs, teaches college-level economics courses, and considers himself an expert in business finance, but readily admitted at trial to advising and encouraging plaintiffs to engage in multiple deals with him and his companies that were clearly to plaintiffs' detriment and defendants' benefit while acting in his role as plaintiffs' paid business advisor and partner. The court is also distressed by the fact that Hynes demonstrated, at times, a total disregard for corporate formalities and the duties he owed to plaintiffs in those roles. The court is further disturbed by the fact that Hynes repeatedly testified to the accuracy of his record-keeping regarding the amounts defendants allege plaintiffs owe them through their various business arrangements, but was unable to plausibly articulate a factual basis for that accounting when questioned. Overall, the court also finds Hynes' testimony to lack credibility.[4]

Because the court finds the testimony provided by the two principal witnesses, both of whom provided the bulk of the testimony heard in this action and the only testimony as to certain key events and documentary evidence, to be largely unbelievable, the court finds itself in the unenviable position of trying to decide the merits of the parties' claims with limited reliable evidence. Based on Dan Folk's and Hynes' lack of credibility and the parties' overall poor presentation of evidence during the course of the trial, the court largely believes that none of the parties should prevail on any of their claims. Moreover, even to the extent the court can adequately analyze the merits of the parties' claims based on evidence it finds credible, the lack of certain evidence and the limited evidence that was admitted leave the court with limited

to his testimony in its findings of fact to the extent it finds that testimony believable.

[4] Nevertheless, as with Dan Folk's testimony, the court cites to Hynes' testimony in its findings of fact to the extent it finds certain testimony believable.

confidence in its ability to accurately determine the damages to which the parties may be entitled with regard to their meritorious claims.

However, the nature of the parties' business relationship and the circumstances created by their business dealings at issue in this action have created a situation where an otherwise simple determination that neither party prevails would be insufficient to ensure that justice is served in this matter, as the status quo would lead to a clearly inequitable result for all parties. Accordingly, in addition to determining the parties' claims on their merits to the extent the credible evidence presented in this action allows, the court looks to two core principles it has drawn from the evidence presented at trial to guide it in determining both the merits of the parties' claims and the relief to which each party is entitled.

First, the court recognizes that Hynes, acting in his roles as plaintiffs' paid business advisor and partner, regularly constructed deals between the parties that favored his companies' and his own interests over plaintiffs' interests, and were antithetical to the responsibility he owed to plaintiffs as his clients and business partners. The court takes this fact into account in determining the extent to which the debts defendants claim plaintiffs owe were incurred through a loan, rent, or other liability legitimately incurred for the purpose of assisting plaintiffs' business operations, and therefore should be paid back, or an exorbitant charge defendants imposed on plaintiffs in violation of the duties Hynes owed to plaintiffs in his multiple roles.

Second, the court takes into consideration the fact that both plaintiffs clearly received substantial sums of money from defendants that considerably benefitted their business operations—and in Dan Folk's case, personal interests as well—and which they regularly accepted, both through signed, written agreements and their course of conduct, as loans they were required to repay to defendants. The court recognizes defendants' significant cash outlay and the attendant risks involved in lending that money to plaintiffs under the circumstances presented by the evidence. Accordingly, the court also seeks to ensure that plaintiffs do not receive an unwarranted windfall or reprieve from legitimate financial responsibilities owed to defendants for a benefit they actually received simply because defendants sought to wrongfully benefit themselves.

With those initial observations and principles in mind, the court now turns to its findings of fact based on the credible evidence presented at trial.

II.    Findings of Fact

The following section constitutes the court's findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1). These Findings of Fact are drawn from witness testimony at trial and the parties' admitted trial exhibits, to the extent the court finds that evidence to be credible.[5]

Dan Folk is the president and founder of Sac EDM, a metal machining company specializing in electrical discharge machining. (Trial Transcript ["Tr."] 35.)[6] Dan Folk stopped attending his college coursework in order to run Sac EDM full time after he started the business in 1982. (Tr. 35-36.) Dan Folk's then-wife, Geraldine Folk, who holds a bachelor's degree in business, handled Sac EDM's accounting and bookkeeping work such as filing the business's taxes, handling payroll, accounts receivable, and accounts payable, and handled such work for the company starting in 2001. (Tr. 69, 207, 884, 1396, 1437-38.) Sac EDM was operated on an accrual basis, as opposed to a cash basis, for accounting purposes, meaning that it would realize an account receivable as a profit on its books once the payment first became due, rather than once the payment was actually received. (Tr. 271, 710.)

Hynes is the president and owner of defendant HAI, which he formed as a corporation about 50 years ago. (Tr. 640.) HAI is involved in the aviation industry, at one time manufactured

---

[5] The court notes that while the findings of fact are presented by the court in a manner that may suggest that it was able to straightforwardly determine what evidence it found persuasive and the factual conclusions to be drawn from that evidence, the reality is that the evidence offered by the parties at trial presented the court with little opportunity to so cleanly make its factual determinations. Indeed, as alluded to in the court's initial observations, the court has little confidence that much of the evidence presented by the parties at trial, even evidence that was not contradicted or called into question on cross-examination, provides the court with an ability to provide a truly accurate account of many key events that occurred over the course of the parties' business relationship. Nevertheless, instead of noting in its findings of fact each and every factual conclusion for which much of the court encountered this problem, the court provides this general observation at the outset of its findings, and specifically notes hereafter only those factual conclusions for which the evidence the parties presented was particularly troubling.

[6] The trial transcript is filed in the docket for this action at ECF Nos. 139, 140, 141, 142, 143, 144, and 145.

helicopters and other aircraft, and, at the time of the parties' dealings, was engaged in aircraft leasing and business consulting relating to the aviation industry.  (Tr. 640, 1325.)  Hynes holds a doctorate degree in aviation and aerospace education from Oklahoma State University, and holds a number of masters, bachelors, and associates degrees in areas relating to aviation and business.  (Tr. 639, 643.)  He has roughly 50 years of experience in the aviation industry and, in addition to HAI, has owned and operated about 20 different businesses within that industry over the course of his career.  (Tr. 639-40.)  Since 1964, Hynes has served as an expert witness regarding aircraft accidents and other aviation-related matters and certain business and finance-related matters in over 600 cases in over 100 different state and federal courts.  (Tr. 640-42.)  Hynes has also taught coursework in the areas of business operations and financial management for Southern Nazarene University's masters of business administration program.  (Tr. 642-43.)  Approximately 40 to 50 years ago, Hynes and his wife, Jane Hynes, formed defendant Hynes Children as a corporation for the benefit of assisting their children.  (Tr. 1029.)  Hynes is the president and managing executive of Hynes Children, and his children are its shareholders.  (Tr. 1328.)[7]

Dan Folk and Hynes first met in either late 2001 or early 2002 when Dan Folk hired Hynes to testify as an expert witness on Dan Folk's behalf in an aviation lawsuit in which Dan Folk was the plaintiff.  (Tr. 38, 59, 1249.)  In early 2003, Hynes came to California to attend a deposition related to the aviation lawsuit.  (Tr. 649-50.)  While Hynes was in California, Dan Folk showed him the Sac EDM facility, and they briefly discussed Sac EDM's business and its finances.  (Tr. 649-51.)  During that time, Sac EDM was experiencing financial difficulties, particularly relating to the fact that it had not yet filed its 2001 and 2002 tax returns, and was having problems maintaining cash flow sufficient to make payroll for its employees and pay its bills when they came due.  (Joint Exhibits ("Exhs.") 120, 122; Tr. 64, 1439.)

////

////

---

[7] The court has no confidence that Hynes Children was actually maintained as a distinct corporate entity.  No corporate records were offered at trial, none of the children testified, and all documents appear to have been prepared by Hynes and signed by himself and Mrs. Hynes.

Over the course of Hynes' next several visits to California for the aviation matter, Dan Folk and Hynes discussed Sac EDM and its troubles relating to the filing of its 2001 and 2002 tax returns and finances; Hynes offered to help. (Tr. 58-59, 69, 651-53.) By May of 2003, Dan and Geraldine Folk had retained Hynes as a business consultant to assist with Sac EDM and its finances. (Exh. 83; Tr. 39.) Over the course of the rest of 2003, Geraldine Folk provided Hynes with some of Sac EDM's financial data, and Hynes provided financial analyses and recommendations based on a review of that data. (Tr. 1444, 1452-55.) Specifically, Geraldine provided Hynes with financial data obtained from Sac EDM's QuickBooks entries, and Hynes prepared an eight-year financial history for Sac EDM based on that information, which he sent to Geraldine on May 15, 2003. (Exh. 118; Tr. 654-55.) Hynes also worked on a business plan for Sac EDM and drafted a pro forma showing how he would structure Sac EDM's tax returns for the years 2001 and 2002 based on his review of its prior returns. (Exh. 306; Tr. 1536.)

In addition, Hynes planned to speak with banks in order to obtain business loans or other financing to fund Sac EDM's operations, and implored both Dan and Geraldine Folk to quickly finalize a business plan for Sac EDM and determine how much financing the business needed to support its operations based on the advice he provided after reviewing Sac EDM's records. (Exh. 121.) The parties also discussed the potential of having Hynes act as a personal lender to Sac EDM. (Exh. 120.) Hynes charged a flat fee of $800 for the consulting services he rendered over the course of 2003, and also charged $115 for the materials he used in rendering those services, for a total of $915, which Hynes invoiced to Sac EDM on December 31, 2003. (Tr. 701.)

On June 12, 2003, Geraldine Folk contacted Hynes via email to obtain his advice regarding Sac EDM's problems relating to its ability to pay its equipment leases held by U.S. Bancorp ("US Banc"). (Exh. 122.) Specifically, Geraldine relayed to Hynes that "US Banc [was] on the verge of defaulting on all 5 of [Sac EDM's] loans with them, taking all of 8 of [Sac EDM's] 12 machines." (Id.) She also stated that Sac EDM would need to give $4,500 to US Bank "tomorrow," which would leave Sac EDM short in its ability to make its upcoming payroll, or else face default on the leases, which would result in repossession of the equipment. (Id.) In addition, she communicated her fear that default would cause US Banc to "go after" the Folks'

1   personal assets, as they had signed a personal guarantee of the leases.  (Id.)  She also remarked to

2   Hynes that Sac EDM had 18 months of payments on the leases left before it would own almost all

3   of the leased equipment under the terms of its lease agreement.  (Exh. 122; Tr. 1410.)  Geraldine

4   asked Hynes for his opinion regarding this situation, specifically asking "whether we should hold

5   off [on making payments] and let [US Banc] start default proceedings."  (Exh. 122.)

6          In late July 2003, Geraldine told Hynes that it "ha[d] not been possible [for Sac EDM] to

7   catch up on past due payments with . . . US Banc" because Sac EDM's sales for the first half of

8   2003 had been very poor and were down from that same period during the prior year.  (Exh. 123.)

9   She also informed Hynes that she had spoken with a bankruptcy attorney, who suggested that the

10  Folks close Sac EDM and set up a sole proprietorship to continue their business operations, and

11  then wait to see if US Bank would pursue the Folks personally for Sac EDM's debt, in which

12  event the Folks would file for personal bankruptcy.  (Id.)

13         On November 10, 2003, Dan Folk sent an email to Hynes relaying the Folks' further

14  communications with their bankruptcy attorney, which resulted in a plan for the Folks to close

15  Sac EDM down as a corporation and begin its operations as a sole proprietorship.  (Exh. 124.)

16  Dan Folk also told Hynes that the Folks were going to file for personal bankruptcy beginning on

17  December 1, 2003, and that he had made an offer to US Banc to enter a stipulated judgment

18  regarding Sac EDM's outstanding lease payments ten weeks prior but had never received a

19  response.  (Id.)

20         In mid-December 2003, the Folks and Hynes met in Tahoe, California and discussed Dan

21  Folk's problems with obtaining lending from banks for Sac EDM's operations.  (Tr. 667.)  Dan

22  Folk also disclosed to Hynes that he did not have enough money to buy Christmas presents for his

23  family and employees, or to pay his employees a Christmas bonus.  (Id.)  Hynes wrote a $10,000

24  personal check to the Folks so they could buy Christmas presents for their family and employees,

25  and afford to give bonuses to their employees.  (Tr. 667, 1122)  The parties considered this

26  payment a loan and agreed that Hynes would return to California in January of 2004 to draft

27  paperwork to make the $10,000 loan "official."  (Tr. 667.)  Also during this meeting, Hynes and

28  Dan Folk devised the initial workings of the parties' first business plan.  (Tr. 669-70.)  The parties

8

determined that Hynes would deposit $200,000 into a special bank account for purposes of making it available for Sac EDM operations when needed.  (Id.)  When Sac EDM would need money, Geraldine was to call Hynes and request a transfer from that pool of funds.  (Id.)

On December 31, 2003, the parties finalized their initial business plan into written form, which Dan and Geraldine Folk signed on January 4, 2004. (Exh. 11.)  The terms of this written business plan established that Sac EDM would begin to transfer all of the income it earned from the work it did for its customers after January 1, 2004, into a bank account held by OK EDM and Waterjet, Inc. ("OK EDM"), a new company devised by the parties to act as a joint venture between Dan Folk, Sac EDM, Hynes, and HAI.  (Exh. 11; Tr. 728.)  In return, OK EDM would provide Sac EDM with operating loans throughout the course of a given month at the times and in the amounts requested by Dan or Geraldine Folk or another authorized Sac EDM employee.  (Tr. 223-34.)  The operating loans were to include interest at a rate of 9.5 percent per annum for any funds Sac EDM actually used, a three percent per annum rate for any other funds held in reserve by OK EDM as "standby funds" that Sac EDM did not use during a given month, and a one-time one percent "set up fee."  (Exh. 11.)  Interest was to be compounded on the loans on a daily basis.  (Tr. 795.)

At the end of each month, Sac EDM was to send an invoice to OK EDM for all of its operating expenses, including payroll, materials purchased, cost to use its machines, lease payments, and other routine items, and OK EDM would deposit the total amount set forth in the invoice into Sac EDM's bank account.  (Exhs. 11, 13.)  This monthly payment was not a loan, and Sac EDM was permitted to recoup the entire amount of the operating loans OK EDM had provided throughout the course of the month through this billing, provided that Sac EDM had applied the loaned money towards its necessary monthly operational expenses.  (Exh. 13; Tr. 705-06, 1190-94.)  Once Sac EDM received its monthly reimbursement, it could, but was not required to, use that money to pay down the operating loans it took out from OK EDM.  (Tr. 1190-94.)  If Sac EDM did not pay down the operating loans it took out from OK EDM in a given month, then the outstanding principal of the loans would remain and interest on that principal would continue to accrue.

The parties entered into this particular business arrangement based on Hynes' representation that it would allow the parties to utilize a tax deduction based on HAI's net operating loss carryforward of over $1 million that was set to expire in two years, which OK EDM would take advantage of through filing a joint tax return with HAI. (Tr. 45-46, 125-26, 691, 1158-59, 1388.) This arrangement was also made on the parties' belief that it would alleviate Sac EDM's cash flow problems by ensuring that it had sufficient capital to pay its operating expenses as they became due. (Exh. 11; Tr. 179, 690.)

The business plan provided that Dan Folk was to draw a salary of $4,000 per month, Geraldine Folk was to draw a salary of $2,000 per month, and Hynes was to draw a salary of $3,000 per month for five years, all as "W-2" employees of Sac EDM. (Exh. 11.) Dan Folk and Hynes were also to draw $4,000 per month each from OK EDM for "management fees" as "1099" contractors. (Id.) The plan also provided that salaries and management fees may be adjusted up or down each month by $1,000 per person after the first 90 days of the plan's implementation. (Id.) The business plan provided further that "where possible all [of Sac EDM's] equipment leases w[ould] be re-negotiated in the name of [OK EDM] with lower interest rates, longer terms, and more favorable purchase options, or the existing equipment would be replaced to accomplish the same goals (lower interest costs, better cash flow, and some equity gain)." (Id.) Finally, the business plan provided that a shareholder loan was to be distributed to Dan and Geraldine Folk in the amount of $25,000 each, which they would reinvest into OK EDM as part of the $200,000 startup capital the parties had envisioned. (Exh. 11; Tr. 737-38.) These loans were to be secured by Dan Folk's stock he was to have in OK EDM and an equity interest in Dan and Geraldine Folk's personal home and rental property. (Exh. 11.)

The parties' initial business plan set up OK EDM as a separate corporation, and Hynes drafted and filed incorporation documents prior to the date the business plan became operational in anticipation of the business plan's implementation. (Tr. 683.) However, Hynes decided prior to drafting the parties' business plan to instead operate the OK EDM joint venture as a d/b/a of HAI based on a belief that the Folks' impending personal bankruptcy could result in a bankruptcy trustee reaching the money they put into OK EDM if it were operated as a corporation. (Tr. 683-

85, 692.)  Accordingly, instead of following the business plan with regard to having the Folks take on a loan to purchase stock to help fund the joint venture, Hynes loaned the full $200,000 startup fund to OK EDM, acting as a d/b/a of HAI, which in turn was to provide operating loans to Sac EDM from that fund, when needed.  (Exh. 195; Tr. 738, 770.)[8]

Hynes initially set up two Bank of America bank accounts under OK EDM, Inc.'s name in early 2004.  (Exhs. 274, 275; Tr. 1133.)  The parties would deposit Sac EDM's income into one of the accounts.  (Exh. 275; Tr. 1132-34.)  Hynes placed standby funds into the other account that OK EDM would withdraw when Sac EDM needed operating loans or requested its monthly reimbursement.  (Exh. 274; Tr. 1132-34.)  Hynes would regularly transfer money between the two accounts.  (Exhs. 274, 275; Tr. 1132-34.)  Once Hynes decided that OK EDM would operate as a d/b/a of HAI, he changed the name on the account into which the parties deposited Sac EDM's income to reflect that fact, but neglected to change the name on the other account.  (Id.)

Each monthly invoice Sac EDM provided to OK EDM for its monthly operating expenses was based on its own calculations, which Hynes generally relied on and honored unless he spotted specific items that he believed were clearly unrelated to Sac EDM's operations, such as a gym membership fee for Dan Folk, which he would deduct from the reimbursement amount he would have OK EDM transfer to Sac EDM at the end of each month.  (Tr. 705-06, 799, 1197-98.)  Similarly, Hynes made calculations and kept records of Sac EDM's financials based on bookkeeping information employees from Sac EDM provided him.  (Exh. 175; Tr. 466-67.)

Hynes initially endeavored to ensure that OK EDM's outstanding loan balance to Sac EDM at any given time was under $300,000.  (Tr. 799.)  However, in January 2004, Sac EDM successfully bid to manufacture armor plating for Humvees for the United States Army.  (Tr. 805-06.)  This contract presented an abnormally large job for Sac EDM and, in order to fulfill that job, Sac EDM required funds greater than what was usually necessary to cover its operating expenses.  (Id.)  Once Dan Folk informed Hynes of the Army contract, Hynes determined that OK EDM would need a larger cash reserve in order to keep up with Sac EDM's operating costs in fulfilling

---

[8] However, the lack of evidence at trial as to how this and subsequent changes actually occurred, as well as Hynes' failure to comply with corporate formalities, was appalling.

11

that contract. (Tr. 805-07.) Accordingly, Hynes increased the funds held by OK EDM from $200,000 to $500,000, so that Sac EDM would have sufficient reserves available to it to fund its operating costs in fulfilling the Army contract. (Tr. 807.) If OK EDM had not supplied operating loans to Sac EDM, it was unlikely that Sac EDM would have had sufficient operating capital to retain and fulfill the Army contract. (Tr. 817-18.)

On January 25, 2004, the parties signed a document revising the accounting policies and other aspects of the OK EDM joint venture. (Exh. 28.) Pursuant to these revisions, Sac EDM was to place all payments it received for the work it performed after January 1, 2004, into one of the Bank of America bank accounts in OK EDM's name every Tuesday and Thursday, or anytime a payment was more than $5,000. (Id.) The revision noted further that "[t]he needs of [Sac EDM] for additional funds will be determined on a month by month basis, with loans extended to [Sac EDM] by OK EDM as conditions warrant." (Id.) Finally, the revision changed the reporting of Sac EDM's monthly payment of consulting fees to Hynes from "W-2" income to "1099" income, in order to highlight Hynes' role as a consultant to Sac EDM. (Id.; Tr. 859.)[9]

On January 27, 2004, Dan and Geraldine Folk filed for personal bankruptcy in order to remove the personal guarantees they made under the US Banc lease contract. (Tr. 90-91, 165-66.) Days prior to that filing, on January 22, 2004, Dan and Geraldine Folk signed a loan agreement with HAI for the $10,000 Dan Folk personally borrowed from Hynes in December of 2003. (Exh. 307.) The loan was secured by a lien on the Folks' personal rental home, which was recorded in the county recorder's office for the purpose of helping the Folks avoid having that property sold off through their personal bankruptcy. (Exh. 136; Tr. 163-66, 1123-24.) The Folks repaid the $10,000 loan in full, and they did not have to sell their rental home as part of their bankruptcy. (Exh. 136; Tr. 166.)

In late 2003 and early 2004, Hynes talked with two separate banks regarding obtaining outside business loans and other funding for Sac EDM's operations. (Tr. 262-63, 877, 895-96, 1030.) These efforts were unsuccessful, and Hynes determined that further efforts to obtain

---

[9] The trial testimony established that virtually every corporate document, business plan and "agreement" was drafted by Hynes.

1  outside financing for Sac EDM's operations would be futile until the parties were able to improve

2  Sac EDM's cash flow and demonstrate that it was financially stable.  (Id.)

3       In February of 2004, Hynes advised Geraldine Folk to keep Sac EDM operating in its

4  corporate form "as long as possible," and to work at its old debts until either it was forced into

5  bankruptcy, at which time it should file to restructure its debts under Chapter 11 of the

6  Bankruptcy Code, or it paid off those debts.  (Exh. 130.)  Hynes also expressed his belief to

7  Geraldine Folk that "every possible effort should be made to work with [US Banc] on their

8  outstanding lease balances" because none of the parties were "in a position to replace this

9  financing and equipment."  (Id.)  He advised her further that Sac EDM should not walk away

10  from its agreement with US Banc based on his belief that "[a] business history of that type is

11  impossible to overcome."  (Id.)

12       At some point in early 2004, Dan Folk began to operate a sole proprietorship, which the

13  parties referred to as "Sac EDM & Waterjet, SP," or "Sac EDM & Waterjet," as a separate

14  business entity operating in conjunction with Sac EDM, the corporate entity.  (Exhs. 16, 30, 162;

15  Tr. 306-11.)  At times throughout 2004 and 2005, Dan Folk operated portions of Sac EDM's

16  business through the sole proprietorship and used that entity to personally make payments on Sac

17  EDM's behalf.  (Exhs. 16, 280; Tr. 306-11.)  During the time the sole proprietorship was in

18  operation, the parties largely treated Sac EDM and the sole proprietorship as a single entity and

19  generally transacted business with those two entities as if they were both a part of the Sac EDM

20  corporate entity.  (Exh. 16; Tr. 306-11, 1019-20.)

21       Between March and May of 2004, the parties revised the OK EDM joint venture's

22  business plan on three occasions and its accounting policy on one occasion (all drafted by Hynes),

23  which resulted in a salary increase of $1,000 per month each for Dan Folk, Geraldine Folk, and

24  Hynes, and other revisions that refined the parties' intentions regarding the operation of the joint

25  venture and reflected the inclusion of Dan Folk's sole proprietorship into the business operations.

26  (Exhs. 17, 18, 19, 30.)  Over the course of the OK EDM joint venture, the parties would either

27  raise or lower their monthly salaries and/or consulting fees on a number of occasions based

28  largely on the income Sac EDM was bringing in at the time; raises were generally made at Dan

Folk's insistence, while reductions were generally made at Hynes' request. (Exh. 88.)

In their fourth amended business plan dated August 1, 2004, the parties removed the language regarding Dan and Geraldine Folk's option to obtain stock in HAI and shareholder loans secured by that stock. (Exh. 31.) It had been Hynes' intention to have the parties remove that language through their prior revisions to the business plan, but he had forgotten to make such a change until the parties' fourth revision. (Tr. 1030, 1142-43.) Neither Dan nor Geraldine Folk had purchased stock in OK EDM or HAI before that language was removed. (Tr. 1146, 1405.)

Shannon Gomez began working part-time at Sac EDM in the summer of 2004 as an outside consultant to help with Sac EDM's financial records, and assist with purchasing and human resources matters. (Tr. 1466-77.) She was hired on as a full time employee of Sac EDM in October of 2004 and largely took over Geraldine Folk's role in handling Sac EDM's bookkeeping, including handling payroll, accounts receivable, accounts payable, and Sac EDM's interactions with its accountant. (Tr. 207, 1467-68.) Shannon Gomez provided Hynes with certain financial information, including a profit and loss balance sheet for Sac EDM's operations, on a monthly basis. (Exh. 241; Tr. 1470-72.) Shannon Gomez was authorized to request and accept operating loans from HAI d/b/a OK EDM on behalf of Sac EDM. (Tr. 476-77, 1475-78.)

At times throughout the course of the OK EDM joint venture, Hynes would unilaterally have HAI d/b/a OK EDM send money to Sac EDM without anyone's prompting from Sac EDM based on Hynes' belief that Sac EDM needed such funds for its operations. (Exhs. 147, 158.) Hynes characterized the funds as operating loans pursuant to the parties' business agreement in the same way he characterized the operating funds requested by Sac EDM's employees as loans. (Exh. 158; Tr. 167-68.) Either Geraldine Folk or Shannon Gomez would accept, on Sac EDM's behalf, the additional loans Hynes provided with the understanding that those additional payments were to be considered loans in the same way the funds they requested were loans. (Tr. 476-77, 1476.) At no time did Sac EDM decline or refund such loans when Hynes would extend them during the course of the OK EDM joint venture. (Exh. 289; Tr. 1477.)

////

////

In August of 2004, Sac EDM sold some equipment that it had owned outright to HAI via an auction in order to raise capital to pay down the balance of the operating loans it owed to HAI d/b/a OK EDM at that time. (Exh. 353; Tr. 798, 905-06, 925.) The sale price of the equipment was based on Dan Folk's estimate of the fair market value for each piece of equipment. (Tr. 1376.) While the parties' purpose behind auctioning off Sac EDM's equipment was to raise capital for Sac EDM to use to pay down its operating loans to HAI d/b/a OK EDM, Sac EDM was free to do what it wanted with the proceeds of those sales. (Exh. 171; Tr. 798.) Nevertheless, it applied those funds towards the outstanding operating loan balance. (Exh. 353.)

Hynes drafted a written master lease agreement under which the purchased equipment would be leased for use in Sac EDM's operations. (Exhs. 1, 363.) Hynes drafted the terms of the master lease based on provisions he liked from Sac EDM's contracts with Dell, Inc. and other third parties that he had reviewed. (Tr. 561, 916-17.)[10] The master lease agreement was signed by Dan Folk on behalf of Sac EDM as lessee, and by Hynes on behalf of Hynes Children as lessor, and was dated August 1, 2004. (Id.) However, the individual leases for each of the eight different pieces of equipment or groups of equipment that fell under the terms of the master lease were dated October 1, 2004, and were signed by Hynes on behalf of "Hynes Aviation Industries, Inc. d/b/a OK EDM and Waterjet and/or SacEDM & Waterjet" as lessee, and Hynes' wife, Jane Hynes, on behalf of Hynes Children as lessor. (Id.)

The monthly lease rates for each leased item under these contracts were calculated by taking the sale price, dividing that amount by 60 (for the number of months Hynes represented each lease was to last), and then adding an additional 30 percent to that amount.[11] (Tr. 927-28, 1105-06.) Hynes initially characterized the additional 30 percent monthly charge as amounting to 10 percent interest, but later, after the lease document had been signed, characterized the

---

[10] Cross-examination of Hynes and a review of the lease terms revealed that his "cutting and pasting" of language from a number of other leases resulted in a master lease agreement with some internally inconsistent terms.

[11] In other words, the monthly loan payments were calculated using the following formula: (purchase price / 60) + 30 percent. For example, an item purchased for $6,000 under such a formula would be charged at a lease rate of $130 per month.

additional charge as 10 percent for interest, plus 10 percent for defendants' "overhead," plus 10 percent for "profit," amounting to a 30 percent surcharge on each monthly payment. (Exh. 150; Tr. 954-55.) Under the terms of the master lease agreement, 50 percent of all of Sac EDM's monthly payments would be credited towards a buyout of each leased item, and the buyout price for each item was the purchase price plus 10 percent. (Exhs. 1, 150.) The master lease also contained a choice of law provision stating that Missouri law governs each lease made under its provisions.[12] (Exh. 1.) It also provided, in all capitalized text, that the lessee under any lease agreements subservient to that master lease "may not assign, sell, transfer, or sublease the products, or [its] interest in [the] lease." (Id.) Neither the master lease nor the individual leases contained a provision regarding the duration of a given lease, but the parties contemplated that each lease would terminate once Sac EDM paid an amount sufficient to exercise its right to purchase the leased equipment under the above formula.[13] (Exh. 150; Tr. 142-47, 1369, 1554.)

Each of the eight individual lease agreements attached to the August 1, 2004 master lease set forth a description of the item or items leased and the lease rate for each item or group of items. (Exh. 1.) Only four of the eight pieces or groups of equipment were initially leased at the time the master lease was signed, and Sac EDM was billed by HAI for those four pieces on a monthly basis starting on August 31, 2004. (Exhs. 277, 363; Tr. 1324.) The initial four leased

---

[12] In their post-trial briefing the parties note their agreement that Missouri law governs the equipment leases at issue based on this choice of law provision.

[13] At trial, Hynes testified that he contemplated the lease term for each equipment lease between the parties to be 60 months and calculated the monthly payments made under those leases with the intention that Sac EDM would be able to buy out the leased equipment at that time, while Dan Folk testified that he understood the lease terms for the equipment to be indefinite, but that Sac EDM could buy out the leased equipment once it paid a sufficient amount. (Tr. 142-47, 1369, 1554.) In addition to this conflicting testimony regarding the term of the leases, the written terms of the leases themselves contain contradictory language regarding lease termination. (Exhs. 1, 2, 3.) Accordingly, in reconciliation of this apparent conflict, the court finds that the parties intended the equipment leases to terminate once Sac EDM exercised its option to purchase the leased equipment under the master lease's purchase provisions after it had made a sufficient number of monthly lease payments. As discussed in further detail below, the parties subsequently entered into two more master lease agreements, on October 1, 2006, and February 1, 2008, respectively, that contain the exact same provisions as the August 1, 2004 master lease. Therefore, the court reconciles the purchase terms contained in those master leases in the same manner it reconciles those contained in the August 1, 2004 master lease.

16

items were all purchased from Sac EDM and then added to the lease. (Tr. 1323-24.) On November 30, 2004, the parties added the fifth and sixth items to the leases, which were pieces of equipment HAI had purchased from a third party supplier, not Sac EDM, with money that HAI had allegedly borrowed from an outside source. (Exh. 277; Tr. 1326-27.) In January of 2005, the last two of the eight items included in the attachments to the August 1, 2004 master lease were purchased from Sac EDM and leased back to it. (Exh. 277; Tr. 1327-28.)

By January of 2005, Hynes Children had purchased the leased equipment from HAI in order to receive a tax advantage, and had begun to lease that equipment to OK EDM as "a division of [HAI]," with the first lease invoice sent to OK EDM on January 31, 2005. (Exh. 277; 1327-30.) In recognition of this fact, Hynes drafted the eight individual lease agreements attached to the August 1, 2004 master lease and backdated each agreement to October 1, 2004.[14] (Exh. 1.) Hynes signed each of the eight lease agreements, one for each piece or group of leased equipment, on behalf of HAI as lessee, and Jane Hynes signed them on behalf of Hynes Children as lessor. (Id.) In September 2005, Hynes Children purchased additional equipment from Tom White, an individual who had recently been hired by Sac EDM, and then began to lease it to HAI d/b/a OK EDM in addition to the eight items leased pursuant to the terms of the master lease agreement dated August 1, 2004. (Exh. 277; Tr. 1337-38.)

////

////

_____

[14] The invoice and testimonial evidence shows that HAI d/b/a OK EDM was the initial lessor and Sac EDM was the initial lessee under the leases for the eight items that were subject to the August 1, 2004 master lease; that HAI sold the subject equipment to Hynes Children, which in turn leased it back to HAI beginning in January 2005; and the equipment subject to the August 1, 2004 master lease was added to the leases between August of 2004 and January of 2005. However, that evidence appears to conflict with the master lease document itself, which was signed on behalf of Hynes Children and dated August 1, 2004; and the eight attached lease documents, which were all dated on October 1, 2004, and signed by representatives of Hynes Children as lessor and HAI as lessee. (Compare Exh. 1 with Exh. 277 and Tr. 1327-30.) In reconciliation of this apparently conflicting evidence, the court concludes that HAI was the initial lessor for each lease, sold its interest in each leased item to Hynes Children by no later than January of 2005, which in turn began leasing the equipment back to HAI d/b/a OK EDM starting on January 31, 2005, and the parties then backdated each of the eight attached lease documents naming Hynes Children as lessor and HAI d/b/a OK EDM as lessee to October 1, 2004.

17

Hynes arranged to have HAI act as lessee under the equipment leases after Hynes Children took over as lessor because Hynes Children's board of directors allegedly wanted to be able to hold Hynes and HAI responsible for any payments due under the leases, instead of Sac EDM, with which Hynes Children's board of directors was unfamiliar. (Tr. 1555-58.)[15] Nevertheless, the parties understood that Sac EDM was to receive the beneficial use of the leased equipment. (Id.) Accordingly, while each of the nine leases under the August 1, 2004 master lease agreement were between Hynes Children as lessor and HAI d/b/a OK EDM as lessee, in practice, Sac EDM used the leased equipment for its operations. (Tr. 1555-56.) HAI continued to bill Sac EDM monthly for each of the nine leases, which Sac EDM paid, despite the existence of the clause in the master lease providing that the lessee could not sublease the equipment. (Exhs. 1, 363; Tr. 1555-56.)

On August 28, 2004, Hynes, acting on behalf of HAI d/b/a/ OK EDM, loaned Dan and Geraldine Folk $150,000, which the Folks loaned to Sac EDM for the purpose of reducing Sac EDM's operating loan debts. (Exh. 291; Tr. 945-48.) The loan was secured by a mortgage on two properties the Folks personally owned at eight percent interest per annum, which was memorialized in a writing signed by Dan and Geraldine Folk on August 30, 2004. (Exh. 291.)

Throughout the course of 2004, HAI, doing business under the trade name OK EDM, reimbursed Sac EDM for its operating expenses on a monthly basis, which included a monthly payment for the use of the equipment Sac EDM leased from US Banc. (Exh. 162.) However, Sac EDM at times failed to remit a portion of that money to US Banc to fully cover the monthly payments it owed to that bank for the equipment it leased. (Id.) This failure caused US Banc to deem Sac EDM in default of its lease agreement and to file an action in the Sacramento County Superior Court against Sac EDM for breach of contract. (Exh. 8.) In August 2004, Hynes sent a check for $172,569 to US Banc in an attempt to resolve fully Sac EDM's payment obligations under the US Banc lease and the pending state court action, but did not receive a response to that offer. (Exh. 160; Tr. 1268-70.) Hynes also unsuccessfully tried to negotiate with US Banc in

---

[15] Once again, no such corporate board minutes were offered as evidence, and there was no testimony from any of the Hynes children.

1  order to extend Sac EDM's payment term under the lease. (Tr. 94.)

2        After sending Sac EDM a notice of sale in November of 2004, US Banc came to Sac

3  EDM's facility to repossess its leased equipment on December 21, 2004. (Exh. 38; Tr. 977-98.)

4  Hynes was present when this occurred, purchased two pieces of the repossessed equipment from

5  US Banc on the spot, and then leased that equipment back to Sac EDM using the same rental

6  calculation and terms contained in the August 1, 2004 master lease agreement. (Tr. 979-80.)

7        In January of 2005, Hynes and the Folks agreed that the Folks would try to obtain a

8  stipulated judgment on Sac EDM's behalf from US Banc regarding the deficiency US Banc

9  claimed was still owing under the equipment lease after repossession, and afterwards, Hynes

10  would attempt to purchase that judgment from US Banc for "pennies on the dollar" and, in turn,

11  Sac EDM would pay Hynes the amount he paid for that judgment plus interest as full satisfaction

12  of the judgment. (Exh. 336; Tr. 100.) The Folks gave Hynes a limit of to $100,000 to purchase

13  the judgment. (Exh. 336; Tr. 101, 1413.) The Folks were planning to sell their personal home at

14  the time and told Hynes that they would use the proceeds from that sale to personally pay Hynes

15  back for the amount paid to purchase the judgment plus interest on Sac EDM's behalf. (Id.) In

16  February of 2005, in keeping with the parties' agreement, Sac EDM entered into a stipulated

17  judgment with US Banc in the deficiency action, Sacramento Superior Court case number

18  04AS03050, for a total of $283,473.77 plus interest. (Exh. 8; Tr. 91.) Hynes subsequently

19  entered into an agreement with US Banc to have HAI purchase the stipulated judgment for a total

20  of $50,000. (Exh. 336.)

21        After Hynes had purchased the stipulated judgment, but before the Folks had paid back

22  the $50,000 plus interest, Hynes approached Dan Folk with a new plan regarding that judgment.

23  Hynes proposed that, after the Folks paid HAI back for its cost to purchase the US Banc

24  judgment, Sac EDM would remain liable to HAI for the entire $283,473.77 owed under that

25  judgment plus interest, but that 50 percent of all of Sac EDM's payments in satisfaction of that

26  liability would be distributed to Dan Folk personally after Sac EDM paid off the entire judgment

27  amount, with the other 50 percent going to Hynes, as "extra profit" under the terms of the parties'

28  business agreement. (Tr. 105-06.)

Based on Hynes' representations, Dan Folk agreed to Hynes' proposal and signed a written amendment to the parties' business plan that reflected those terms. (Exh. 162; Tr. 1571.) The written agreement acknowledged that the purpose behind Hynes' purchase of the deficiency judgment from US Banc was "to preclude further legal action against Folk and their [*sic*] companies for any resulting deficiency." (Id.) The agreement provided that the Folks would pay back the $50,000 HAI paid to purchase the stipulated judgment from US Banc at an interest rate of eight percent per annum, and that a monthly payment of one percent of the loan balance was to be paid from Dan Folk's share of the OK EDM joint venture's profit until the Folks paid off the balance of that charge.[16] (Id.) The agreement provided further that after the Folks paid Hynes back for the purchase cost, Sac EDM would begin to make payments on the full balance of the judgment plus interest. (Id.) It also stated that Sac EDM would not have to begin making payments on the full amount of the judgment for one year, but that interest would continue to accrue prior to the first payment. (Id.) Upon Sac EDM's payment of the full judgment, the terms of the written agreement entitled Dan Folk to receive 52.5 percent and Hynes 47.5 percent of those payments as a lump sum "profit" payout. (Id.) The agreement also stipulated that the Folks would personally guarantee Sac EDM's payment of the full judgment. (Id.) After the agreement was signed, Hynes determined that Sac EDM was not permitted to include its payments on the judgment as part of the operating costs it billed to OK EDM for reimbursement every month based on his claim that those payments arose from a liability that existed prior to January 1, 2004. (Exh. 338; Tr. 1243-44.)

In August of 2005, the Folks sold their home for $895,000 and were able to apply $52,451.51 of the proceeds from that sale towards the full satisfaction of the amount they owed Hynes for his purchase of the US Banc judgment plus the interest that had accrued on that balance as of that time. (Exhs. 291, 338; Tr. 100, 104, 952.) They also used some of those proceeds to

---

[16] While Hynes testified at trial that the $50,000 loan he provided to the Folks was to cover a charge for his services in negotiating with US Banc on Sac EDM's behalf and for his willingness to put his own money on the line to purchase the judgment (Tr. 963-64, 967, 1265), the court finds that testimony to lack credibility in light of the preponderance of the evidence demonstrating that the $50,000 charge to the Folks was to reimburse the amount HAI spent to purchase the judgment from US Banc and then deem it satisfied.

satisfy fully the balance remaining on the $150,000 mortgage that HAI d/b/a OK EDM, had placed on their personal properties on August 30, 2004. (Exh. 291; Tr. 951-52.) On August 31, 2005, Dan Folk charged Sac EDM for the $52,451.51 the Folks paid to HAI to resolve the US Banc judgment on Sac EDM's behalf. (Exh. 61.) The terms of that loan provided for 9.5 percent interest per annum and that Sac EDM would begin to make payments to Dan Folk on that debt beginning in January of 2006. (Id.) Sac EDM began making payments on that debt on January 1, 2006, and fully satisfied its payment obligation to Dan Folk on March 1, 2007. (Id.)

After HAI purchased the US Banc judgment, but before Sac EDM began to make monthly payments on that debt, HAI sold the note for the US Banc judgment to Hynes Children. (Tr. 1027-28.) In January of 2006, Sac EDM began making monthly payments to Hynes Children on the full amount of the US Banc judgment that HAI had purchased plus 10 percent interest, which was set per the terms of the original settlement with US Banc. (Exh. 338; Tr. 115, 1028-29.) On January 1, 2008, HAI wrote Hynes Children a check for $129,052.45 to repurchase the note on the US Banc judgment. (Exh. 71; Tr. 1027-29.) From that date forward, Sac EDM made its monthly payments on that judgment to HAI. (Exh. 84; Tr. 1027-29.) Sac EDM continued to do so until it altogether stopped making such payments in April of 2010. (Exh. 84.)

Around the beginning of 2005, Dan and Geraldine Folk separated from one another and began the process of getting a divorce, which was finalized in 2008. (Tr. 465, 1338, 1396.) During the divorce process, Dan Folk bought out any financial interest Geraldine Folk had in the Sac EDM business operation, and, on December 12, 2007, Hynes, HAI, and Hynes Children all signed a release of any financial obligations Geraldine Folk may have owed to them in relation to the parties' business dealings. (Exh. 204; Tr. 1338.)

During the course of the divorce proceedings, Dan Folk had to incur substantial additional personal expenses, such as finding a new residence, which caused him to seek out advances on his share of OK EDM's profits, which Hynes provided to him interest free. (Exh. 59; Tr. 524, 1004-07.) In order to obtain funds for personal use, Dan Folk also had Sac EDM write checks to him, which was a practice both Dan and Geraldine Folk had engaged in since prior to the commencement of the OK EDM joint venture, and would consider that amount a loan from the

1  company that he was obligated to pay back. (Exhs. 168, 177; Tr. 458-62, 1211-13, 1441-42,
2  1491, 1500-04.) These personal expenses paid for by Sac EDM could not be reimbursed each
3  month by way of its monthly invoice to OK EDM because they were not a part of Sac EDM's
4  necessary operating expenses. (Tr. 705-06, 799, 1197-98.)

5       Throughout the course of 2005, Sac EDM operated at a loss. (Exhs. 171, 177.)
6  Accordingly, around September of 2005, Hynes agreed to temporarily cut the interest rate on the
7  operating loans OK EDM provided to Sac EDM down to 5 percent in order to further improve its
8  cash flow and its profit and loss balance. (Exh. 171; Tr. 996-98.) Hynes also agreed to
9  temporarily reduce Sac EDM's monthly equipment lease costs by about $3,000. (Exh. 171.)

10      On January 15, 2006, Hynes prepared, and Dan Folk and Hynes signed, a business
11  relationship withdrawal plan that provided terms under which the parties could withdraw from the
12  OK EDM joint venture. (Exh. 21; Tr. 1008-10.) This agreement provided that either party could
13  terminate the joint venture upon 30 days' notice, but that the actual effective date for termination
14  would be either 30 days after that notice, or as soon as Sac EDM and/or Dan Folk did not owe
15  any money to Hynes or HAI, including any accounts receivable, the US Banc judgment, or loans
16  of any type, whichever event came later. (Exh. 21.) The agreement provided further that if a
17  party provided notice of termination, Hynes would continue to provide and receive compensation
18  for his consulting services in a manner similar to the time prior to that notice until he and his
19  companies had been paid by Sac EDM and Folk in full, at which time the parties would begin to
20  wind down such services while still providing Sac EDM the option to continue leasing equipment
21  from defendants. (Id.)

22      On June 30, 2006, Hynes Children began to bill Sac EDM directly for the eight items
23  included in the attachments to the August 1, 2004 master lease and the Tom White equipment,
24  which was also leased under the terms of the August 1, 2004 master lease. (Exh. 277.)
25  Nevertheless, Sac EDM continued to remit its monthly payments for that equipment to HAI.
26  (Exh. 363.)
27  ////
28  ////

On October 1, 2006, Sac EDM and HAI entered into a second master lease agreement for certain equipment that HAI had purchased for Sac EDM's use in its operations for the OK EDM joint venture. (Exhs. 2, 363.) The terms of the master lease agreement were substantially the same as those contained in the August 1, 2004 master lease. (Id.) This second master lease was signed by Dan Folk on behalf of Sac EDM as lessee and by Hynes on behalf of HAI as lessor. (Id.) This agreement included two attachments describing each piece of leased equipment and the rates at which that equipment was leased, which were derived from the same calculation used to determine the rates of the leased equipment associated with the August 1, 2004 master lease. (Id.) Unlike the attachments for the individual pieces or groups of equipment leased under the August 1, 2004 master lease, the two attachments to the October 1, 2006 master agreement named the lessee as Sac EDM and lessor as HAI and were drafted at the same time as the master agreement. (Id.)

By early 2007, as a result of Sac EDM's operating losses, Hynes and HAI were allegedly taking out their own loans in order to ensure there was a sufficient pool of funds available to provide Sac EDM with operating loans when requested. (Exh. 197.) Also around that time, Hynes approached Dan Folk about obtaining "key man" life insurance policies on both of their lives for the purpose of ensuring Sac EDM's outstanding operating loans were paid off in the event of Dan Folk's or Hynes' death. (Tr. 1021-23.) On March 28, 2007, Dan Folk and Hynes signed another amendment to the parties' business plan. (Exh. 64.) Through this amendment, they agreed that HAI would purchase and pay for term life policies on the lives of Dan Folk and Hynes in an amount of $500,000 on each person, with the beneficiary of each policy being HAI. (Id.) The parties agreed that the cost of each policy was to "be considered a necessary cost of operations of the OK EDM program and included with the normal expenses on a monthly basis," meaning that Sac EDM was ultimately responsible for repaying HAI for those expenses, but could seek loans and reimbursement through the OK EDM joint venture. (Id.; Tr. 547.) The proceeds from the policy taken out on Dan Folk were to be used to fund Sac EDM's operations in the event of his death until either it was sold or HAI elected to continue its operations. (Id.) The proceeds from the policy taken out on Hynes were to be applied in full satisfaction of all then-

existing loans Sac EDM owed to HAI and the US Banc stipulated judgment, even if those liabilities exceeded the $500,000 payout. (Id.) However, those proceeds could not be applied towards the amounts Sac EDM owed under the equipment leases. (Id.)

In accordance with the parties' amended business plan, a $500,000 term life insurance policy with a 20-year term was taken out on Dan Folk's life with HAI named as the beneficiary. (Exh. 64.) The yearly premium amount on the policy was $3,979, amounting to monthly payments of roughly $340. (Id.) The term of the policy was set at 20 years based on Hynes' belief at the time that that amount of time would be necessary for Sac EDM to pay back all of the debts he claimed were owed to defendants. (Tr. 1025-26.)

A life insurance policy of $500,000 was also taken out on Hynes' life with HAI as the beneficiary on August 15, 2007. (Exh. 64.) The plan had a lifetime term and a yearly premium of $18,686.92, amounting to monthly payments of roughly $1,560. (Id.) The large difference in premium payments between the two policies was primarily attributable to the fact that Hynes was in his seventies at the time, while Dan Folk was in his forties. (Tr. 176.)

Both insurance policies became effective in October of 2007. (Exhs. 64, 238.) Accordingly, that month, HAI began to invoice Sac EDM $1,900 per month for the combined monthly total of the two insurance policies' premiums pursuant to the parties' agreement, and Sac EDM began sending that amount to HAI each month to cover that expense. (Exh. 238.) Hynes later approached Dan Folk and requested that he own the insurance policy on Dan Folk in order to ensure that Dan Folk did not change the policy, and Dan Folk agreed. (Tr. 549-51.) Beginning March of 2009, Sac EDM began to send only $50 per month to HAI for the insurance premiums based on Dan Folk's contention that that amount covered the reasonable cost of life insurance on his life alone. (Exh. 238; Tr. 853.)

On July 30, 2009, Dan Folk requested that Hynes not renew the insurance policy on Dan Folk's life and insisted that he could get a new term policy in place within a couple of months, but Hynes did not agree to cancel it. (Exhs. 96, 102, 217; Tr. 182-83.) Nevertheless, Sac EDM continued to make the $50 per month payment to HAI for the premiums until it stopped making payments altogether in July of 2011 at Dan Folk's insistence. (Exh. 102; Tr. 853.) HAI has

continued to make full premium payments on both policies since Sac EDM began to pay a reduced amount in February of 2009.

On July 31, 2007, HAI began to charge a reduced flat rate of $5,000 per month for all nine leases under the August 1, 2004 master lease, and continued to bill Sac EDM at that monthly rate for the remainder of 2007. (Exhs. 277, 363; Tr. 1346.) HAI once again charged Sac EDM for the full amount on these leases beginning in January of 2008. (Id.)

On February 1, 2008, Sac EDM and HAI entered into a third master lease agreement for certain equipment that HAI had purchased for Sac EDM's use in its operations for the OK EDM joint venture. (Exhs. 3, 363.) The terms of the master lease agreement were substantially the same as those contained in the August 1, 2004 and October 1, 2006 master leases. (Exhs. 1, 2, 3, 363.) This third master lease was signed by Dan Folk on behalf of Sac EDM as lessee and by Hynes on behalf of HAI as lessor. (Exhs. 3, 363.) This agreement included five attachments describing each piece of leased equipment and the rates at which that equipment was leased, which were derived from the same calculation used to determine the rates of the leased equipment associated with the August 1, 2004 and October 1, 2006 master leases. (Id.) Similar to the October 1, 2006 leases, each of the five attachments to the February 1, 2008 master lease named the lessee as Sac EDM, the lessor as HAI, and were drafted at the same time as the master agreement. (Id.)

On July 19, 2008, Dan Folk and Hynes signed a written "Business Relationship Profit Withdrawal Plan." (Exh. 75.) Pursuant to this agreement, Sac EDM was to discontinue its operation as a vendor to HAI on September 1, 2008, meaning that Sac EDM would retain all income from its accounts receivable from that date forward and would not send those funds to HAI d/b/a OK EDM. (Exhs. 75, 76, 77.) However, the parties were to continue the profit sharing ratio set forth in their business plan. (Id.) Hynes and HAI were also to continue providing operating loans to Sac EDM for at least six months, longer if Sac EDM could generate profits sufficient to repay those loans and Hynes had access to such capital to provide the loans, under the lending terms set forth in the previous business plans. (Id.)

////

In October of 2008, Dan Folk insisted that the monthly payments on each of the leases be reduced to improve Sac EDM's cash flow, and Hynes agreed. (Tr. 1353-56.) Accordingly, beginning with the October 31, 2008 billings, HAI reduced the amounts on its lease invoices by 10 percent, and Hynes Children reduced the payments for the leases it held by 20 percent. (Exh. 277; Tr. 1353-56.)

Around the end of 2008, the board of directors of Hynes Children allegedly expressed its concern to Hynes about having Hynes Children continue as a lessor under the equipment leases. (Tr. 1342-43.) Accordingly, on December 31, 2008, Hynes Children assigned via writing "all right, title, and interest" it had in any lease agreements under which it was named as lessor and "Sacramento E.D.M., Inc. and/or SacEDM & Waterjet, SP and/or Dan Folk, an individual" as lessee to HAI in exchange for one dollar "and other valuable consideration." (Exh. 363.) The agreement also acknowledged that HAI was now the owner of the property described in such leases and that the lessee would send all payments under those leases to HAI. (Id.) This agreement was signed by Jane Hynes on behalf of Hynes Children, and Hynes on behalf of HAI. (Id.) Accordingly, beginning with the February 28, 2009 billing, HAI began to send to Sac EDM a single invoice for all of the equipment subject to each of the three master leases. (Exh. 277.)

By early 2009, Dan Folk had retained the services of attorney Gregory Beyer to assist him in communicating with Hynes regarding the parties' remaining financial ties and the parties' disputes regarding the payment of the outstanding debts Hynes claimed were owed by plaintiffs to him and his companies, but the parties were unable to reach an agreement. (Exhs. 80-89, 101.)

Beginning in March of 2009, Sac EDM began to pay less than the full amount HAI invoiced it each month for the leased equipment. (Exhs. 277, 363; Tr. 1359.) This reduction occurred because Dan Folk instructed Shannon Gomez to send a check each month for less than the amount invoiced by HAI. (Id.) HAI accepted the reduced payments because Hynes did not want to declare the leases in default and repossess the equipment based on his belief that declaring default and repossessing the leased equipment "wouldn't help anybody out." (Tr. 1359.) HAI did not assess any additional fees or penalties to Sac EDM for failing to pay the full amounts due on the invoices. (Tr. 1379-80.)

In September of 2010, Dan Folk sold one of the pieces of leased equipment, identified by the parties as a "Sodick AM3L large sinker EDM" in the fourth attachment to the February 1, 2008 master lease and as lease number 14, to a third party buyer in Mexico for $4,200. (Exh. 223; Tr. 561-62.) When Dan Folk communicated this fact to Hynes, Hynes accused Dan Folk of stealing that property from Hynes and his companies and demanded that Sac EDM send a check for the amount it would cost to buy that piece of equipment under the terms of the master lease agreement, which Hynes calculated to be $22,770. (Exh. 225; Tr. 566.) After some further disagreement between Dan Folk and Hynes regarding the buyout price, Dan Folk ultimately had Sac EDM send HAI a check for the amount Hynes demanded to buy out the lease. (Exhs. 224, 225, 228, 230; Tr. 566-574.) Beginning with the October 2010 billing for the equipment leases, HAI no longer charged Sac EDM for the "Sodick AM3L large sinker EDM," the fourteenth lease. (Exh. 277.)

In October of 2010, Dan Folk and Hynes discussed the possibility of cancelling the equipment leases, but Dan Folk reconsidered and expressed his desire to not terminate the leases on October 21, 2010, after Hynes explained that Sac EDM would lose all of the equity it had built up in the leased equipment through its prior payments. (Exhs. 230, 231.)

In August of 2011, Dan Folk attempted to provide Hynes with notice that Sac EDM desired to terminate all of the equipment leases that the parties had entered into, but Hynes convinced him to reconsider after offering to allow Sac EDM to pay $6854.60 per month with a five percent interest rate, which Hynes concluded would allow Sac EDM to exercise its option to purchase all of the leased equipment in five years' time under the buyout formula set forth in the three written master lease agreements. (Exhs. 109, 277.) Sac EDM began to pay that amount each month until December of 2011, when Dan Folk instructed Shannon Gomez to contact Hynes and tell him that Sac EDM would stop sending any payments to HAI for the leased equipment. (Exh. 277; Tr. 1364-65.) By January of 2012, Sac EDM had altogether stopped making monthly payments to HAI on any of the 20 equipment leases.[17] (Exh. 363.)

---

[17] Specifically, Sac EDM stopped making monthly payments on lease numbers 11 and 12 in November of 2011; lease numbers 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 13, 15, 16, and 17 in December of

On June 25, 2012, Dan Folk wrote to Hynes stating that he was once again interested in having Sac EDM make payments on the leased equipment, but would only do so on the condition that Hynes agree to the payment terms he proposed in August of 2011; Hynes did not agree to these terms.[18]  (Exhs. 256, 257, 258; Tr. 282-83.)

On July 31, 2012, Sac EDM made its last payment towards the outstanding operating loan balance.  (Exh. 289.)  After that payment was applied, the outstanding operating loan balance owed by Sac EDM to HAI was allegedly $516,777.35.  (Id.)

On October 4, 2012, plaintiffs filed the present action in the Sacramento County Superior Court, which was removed to this court by defendants on February 14, 2013.  (ECF No. 2.) Defendants Hynes and HAI initially asserted their counterclaims in an action filed in the United States District Court for the Western District of Missouri on December 10, 2012.  (ECF No. 81.) That action was subsequently transferred in to this court, and then consolidated with the present action.  (ECF No. 86.)

On February 13, 2015, HAI renewed the US Banc judgment in Sacramento County Superior Court case number 04AS03050, the action originally filed by US Banc against Sac EDM, as the assignee of record.  (Exh. 305.)  The renewed judgment amount was for $247,393.60.  (Id.)

////

////

////

////

---

2011; and lease numbers 18, 19, and 20 in January of 2012.  (Exh. 363.)

[18] While both the June 25, 2012 writing and Dan Folk's testimony regarding this document refer to Hynes' proposal regarding revising the terms of the leases as having been made in August of 2009, the specific terms of the revised lease agreement Dan Folk referred to in his letter and testimony and the invoice documents in evidence more strongly suggest that Dan Folk meant to refer to the proposal Hynes made in August of 2011.  Given the general unreliability of Dan Folk's testimony, particularly with regard to remembering the specific timeframes during which the events at issue occurred, the court finds that Dan Folk intended to refer to the proposal made in August of 2011, not 2009, when he sought to resume lease payments in June of 2012.

III.    Conclusions of Law

    A.    Initial Matters

        1.    Waiver of Plaintiffs' Defenses to Defendants' Counterclaims

As an initial matter, defendants argue in their post-trial briefing that plaintiffs have waived all of the affirmative defenses they assert with regard to Hynes' and HAI's counterclaims because plaintiffs never filed an answer to the counter-complaint. Plaintiffs acknowledge that they never filed an answer to defendants' counter-complaint, but urge that their failure to file such a pleading was an oversight due to the genesis of the counter-complaint filed in this action. Plaintiffs represent that Hynes and HAI initially filed their claims against plaintiffs as a separate action filed in the United States District Court for the Western District of Missouri, which was subsequently transferred to this district as a separate action and then later consolidated into the present action. Plaintiffs represent further that they were represented by different counsel while the action was pending in the Western District of Missouri and that their failure to file an answer is based on an erroneous belief that an answer had already been filed by their previous counsel while the action was still pending in that court. Plaintiffs argue that their failure to file an answer should not have a fatal effect on their defenses to Hynes' and HAI's counterclaims because plaintiffs' defenses have been asserted in such a manner over the course of this action such that defendants have been given fair notice of plaintiffs' defenses and have not been unduly prejudiced by the lack of an answer. The court finds plaintiffs' arguments to prevail on this issue.

"The purpose of . . . pleading [an affirmative defense] is to give the opposing party notice of the [defense] and a chance to argue, if he can, why the imposition of [the defense] would be inappropriate." Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 350 (1971). It appears the Ninth Circuit Court of Appeals has not yet provided a decision on whether the lack of an answer asserting affirmative defenses entirely precludes a party opposing a counterclaim from asserting defenses to that counter-claim. However, it has held that the failure to raise an affirmative defense in an answer to a complaint does not bar a defendant from raising that defense later on in the litigation "[i]n the absence of a showing of prejudice" to the plaintiff. Camarillo v. McCarthy, 998 F.2d 638, 639 (9th Cir. 1993) ("Qualified immunity is an affirmative defense that

should be pled by the defendant. In the absence of a showing of prejudice, however, an affirmative defense may be raised for the first time at summary judgment." (internal citation omitted)). Similarly, a number of other federal appeals courts have addressed the issue of whether defenses are automatically waived if they are not raised in an answer, and have taken an approach that is forgiving of parties raising defenses for the first time outside of an answer. Indeed, such courts have held that "strict adherence to the pleading requirement is inappropriate when the purpose of the requirement has been otherwise fulfilled." Ahmad v. Furlong, 435 F.3d 1196, 1201 (10th Cir. 2006). Based on these principles, a number of federal appeals courts have ruled that a defense may be raised for the first time outside of an answer without waiver under circumstances where that "defense is raised in sufficient time that there is no prejudice to the opposing party." Ahmad, 435 F.3d at 1201; see also Williams v. Ashland Eng'g Co., 45 F.3d 588, 593 (1st Cir. 1995) ("Rule 8(c)'s core purpose [is] to act as a safeguard against surprise and unfair prejudice . . . . Where, as here, a plaintiff clearly anticipates that an issue will be litigated, and is not unfairly prejudiced when the defendant actually raises it, a mere failure to plead the defense more particularly will not constitute a waiver."); Saks v. Franklin Covey Co., 316 F.3d 337, 350 (2d Cir. 2003) ("[A] district court may still entertain affirmative defenses [not pleaded in the answer] at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings."); Pro v. Donatucci, 81 F.3d 1283, 1286 n. 2 (3d Cir. 1996) ("Our court previously has taken the position that whether an affirmative defense that must be pleaded in the answer is waived will depend on whether the defense was raised at a pragmatically sufficient time and the plaintiff was prejudiced in the ability to respond." (internal quotation marks omitted)); Brinkley v. Harbour Recreation Club, 180 F.3d 598, 612 (4th Cir. 1999) ("[T]here is ample authority in this Circuit for the proposition that absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion."); Giles v. Gen. Elec. Co., 245 F.3d 474, 491-92 (5th Cir. 2001) ("Although failure to raise an affirmative defense under rule 8(c) in a party's first responsive pleading generally results in a waiver, where the matter is raised in the trial court in a manner that does not result in unfair surprise technical

30

failure to comply with Rule 8(c) is not fatal." (internal quotation marks, brackets, and ellipses omitted)); Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1445 (6th Cir. 1993) ("It is well established, however, that failure to raise an affirmative defense by responsive pleading does not always result in waiver."); Fin. Timing Publ'ns, Inc. v. Compugraphic Corp., 893 F.2d 936, 944, n.9 (8th Cir. 1990) (affirmative defense not waived when other "notices were sufficient to avoid unfair surprise"); Grant v. Preferred Research, Inc., 885 F.2d 795, 797 (11th Cir. 1989) ("[I]f a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. When there is no prejudice, the trial court does not err by hearing evidence on the issue." (internal quotation marks and citation omitted)).

Here, while plaintiffs did not file an answer asserting their affirmative defenses to Hynes' and HAI's counterclaims, the parties have had a seven-day trial on the merits of the parties' claims and defenses in this action, in addition to extensive post-trial briefing that included reply briefing that defendants used to address each of the affirmative defenses plaintiffs assert. Furthermore, under the circumstances presented in this action, plaintiffs' claims against defendants are in the nature of counterclaims to the claims Hynes and HAI raise in their counter-complaint, but could also easily be construed as defenses to Hynes' and HAI's counterclaims because plaintiffs' success on the merits of those claims would necessarily preclude those defendants from prevailing with respect to some or all of the contractual and quasi-contractual relief they seek through their counterclaims. See Fed. R. Civ. P. 8(c)(2) ("If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so.").

Nothing in the record suggests that plaintiffs' failure to file an answer to Hynes' and HAI's counter-complaint kept those defendants from seeking discovery that they would have sought had an answer asserting plaintiffs' defenses been filed, nor is there any indication that those defendants have been unable to adequately respond to the defenses plaintiffs assert. It is clear from the trial transcript and the parties' post-trial briefing that defendants have received fair

31

notice of plaintiffs' defenses to Hynes' and HAI's counterclaims and have taken the opportunity to fully respond to each of those defenses. The notice plaintiffs provided with regard to each of their defenses to Hynes' and HAI's counterclaims was sufficient to avoid unfair surprise or prejudice to those defendants. Accordingly, the court finds that plaintiffs have not waived their affirmative defenses.

## 2. Statutes of Limitations

Defendants also argue as an initial matter that all of plaintiffs' claims are barred by the applicable statutes of limitations.

The applicable limitations period for plaintiffs' claim for breach of fiduciary duty is four years, Cal. Code Civ. Proc. § 343, while a three year limitations period applies to plaintiffs' fraud and constructive fraud claims, Cal. Code Civ. Proc. § 338; see also Boyd v. Blankman, 29 Cal. 19, 46 (1865). Defendants argue that the latest plaintiffs could have first become aware of the wrongdoing alleged against defendants with regard to plaintiffs' claims for breach of fiduciary duty, fraud, and constructive fraud was either March or April of 2009, which defendants assert is when the evidence presented at trial shows that attorney Beyer began representing plaintiffs with regard to the parties' business relationship. However, the court finds this argument unpersuasive because the nature of plaintiffs' claims for breach of fiduciary duty, fraud, and constructive fraud as plaintiffs alleged them in the complaint and asserted them at trial demonstrates that plaintiffs timely asserted those claims under the continuing violation doctrine.

"The continuing violation doctrine aggregates a series of wrongs or injuries for purposes of the statute of limitations, treating the limitations period as accruing for all of them upon commission or sufferance of the last of them." Aryeh v. Canon Bus. Sols., Inc., 55 Cal. 4th 1185, 1192 (2013). "Allegations of a pattern of reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period." Id. at 1197.

////

////

Here, plaintiffs assert their claims for breach of fiduciary duty, fraud, and constructive fraud based on a theory that Hynes, acting on behalf of the other two defendants, engaged in conduct that was both a breach of his fiduciary duty to plaintiffs and fraudulent throughout the course of the parties' business relationship, which spanned into 2012. More specifically, plaintiffs assert those claims based on Hynes' crafting of certain deals and business arrangements, such as the equipment leases between defendants and Sac EDM, the agreement setting forth the terms of repayment on the US Banc judgment, and the provision of operating loans to Sac EDM, that caused continuing harm to plaintiffs with each additional payment defendants sought to extract from plaintiffs via the terms of those agreements. Defendants continued their practice of billing plaintiffs into 2012 and beyond pursuant to the terms of these agreements that were allegedly entered into based on defendants' tortious actions, and still seek to collect those amounts through their counterclaims in this present action. Accordingly, the court concludes that plaintiffs' breach of fiduciary duty, fraud, and constructive fraud claims have been asserted within the applicable limitations periods for those claims under the continuing violation doctrine.[19]

A two-year limitations period applies to plaintiffs' claim for tortious interference with contract.[20] Kiang v. Strycula, 231 Cal. App. 2d 809, 811-12 (1965); see also Cal. Civ. Proc. Code § 339(1). "A tortious-interference claim typically accrues 'at the date of the wrongful act.'" DC Comics v. Pac. Pictures Corp., 938 F. Supp. 2d 941, 948 (C.D. Cal. 2013) (quoting Trembath v. Digardi, 43 Cal. App. 3d 834, 836 (1974)). "But in no event does a claim accrue 'later than the actual breach of the contract by the party who was wrongfully induced to breach,' because the breach is the culmination of the alleged wrong." Id.

---

[19] Furthermore, even if the court were to accept defendants' argument that the applicable limitations periods began to run in either March or April of 2009, plaintiffs' breach of fiduciary duty claim would still fall within the applicable four-year limitations period as it was first asserted when plaintiffs initially filed this action in state court on October 12, 2012. (See ECF No. 2.)

[20] A two-year limitations period also applies to plaintiffs' claims for negligent and intentional interference with contract. However, as discussed below, plaintiffs request the court to dismiss those two claims based on an admission that insufficient evidence with regard to those claims was presented at trial. Accordingly, the court declines to address defendants' statute of limitations argument with regard to those claims.

33

Here, plaintiffs premise their claim for tortious interference with contract on the assertion that Hynes wrongfully induced Sac EDM to breach the equipment lease contract it had with US Banc.  A preponderance of the evidence demonstrates that, at the absolute latest, Sac EDM breached that contract in late 2004.  Plaintiffs commenced the present action, and thus first asserted their claim for tortious interference with contract, in the Sacramento County Superior Court on October 12, 2012, well beyond the two-year limitations period.  (See ECF No. 2.)  Unlike their other claims, plaintiffs cannot demonstrate a continuing violation with regard to their tortious interference with contract claim because the breach of their contract with US Banc was necessarily "the culmination of the alleged wrong," and thus the beginning of the two-year limitations period.  DC Comics, 938 F. Supp. 2d 941, 948.  Accordingly, the court concludes that plaintiffs' claim for tortious interference with contract is barred by the applicable statute of limitations.[21]

### 3.   Plaintiffs' Claims for Unjust Enrichment and Declaratory Relief

The court also addresses as an initial matter plaintiffs' claims for unjust enrichment and declaratory relief, which plaintiffs assert in their pleading as independent claims.  Declaratory relief and unjust enrichment are not independent causes of action under California law; instead, they are forms of relief that may be requested in conjunction with a cognizable cause of action

---

[21] Moreover, the court concludes that plaintiffs fail to meet their burden to prove all of the elements necessary to support their tortious interference with contract claim on the merits.  In particular, the court finds that plaintiffs fail to establish evidence sufficiently demonstrating that Hynes engaged in intentional actions that were designed to induce a breach or disruption of the contractual relationship between Sac EDM and US Banc.  See Quelimane Co. v. Stewart Title Guar. Co., 19 Cal. 4th 26, 55 (1998) (quoting Pacific Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal.3d 1118, 1126 (1990)).  Contrary to plaintiffs' assertion that Hynes engaged in such conduct and caused the breach of Sac EDM's equipment lease with US Banc, the evidence demonstrates that Hynes actually encouraged both Dan and Geraldine Folk to ensure that Sac EDM did not default on its US Banc lease and provided Sac EDM with a business structure that provided it the opportunity to obtain sufficient operating capital to cover the monthly US Banc lease payments, among other expenses, through the OK EDM joint venture.  Furthermore, the evidence demonstrates that, despite this opportunity, Sac EDM still decided to stop making its monthly lease payments to US Banc, thereby causing US Banc to declare Sac EDM in default.  Accordingly, the court concludes that even if plaintiffs' tortious interference with contract claim was not barred under the statute of limitations, plaintiffs could not prevail on the merits of that claim based on the evidence presented at trial.

34

that permits a court to grant such relief. <u>Ward v. Wells Fargo Bank, N.A.</u>, 2011 WL 2458058, at

*5 (E.D. Cal. June 16, 2011) ("Declaratory relief is not an independent claim, rather it is a form

of relief."); <u>Munoz v. MacMillan</u>, 195 Cal. App. 4th 648, 661 (2011) ("There is no freestanding

cause of action for 'restitution' in California."); <u>Hill v. Roll Int'l Corp.</u>, 195 Cal. App. 4th 1295,

1307 (2011) ("Unjust enrichment is not a cause of action," therefore providing no basis for relief

in the absence of an actionable wrong); <u>see also</u> <u>Lane v. Vitek Real Estate Indus. Group</u>, 713 F.

Supp. 2d 1092, 1104 (E.D. Cal. 2010); <u>Santos v. Countrywide Home Loans</u>, 2009 WL 3756337,

at *5 (E.D. Cal. Nov. 6, 2009); <u>Melchior v. New Line Productions, Inc.</u>, 106 Cal. App. 4th 779,

793 (2003). Therefore, plaintiffs cannot obtain such relief independent of proving their other

claims on the merits and that such relief is warranted with regard to their successful claims.

Accordingly, the court dismisses these claims to the extent they are asserted independently of

another cause of action, but considers the requested remedies to the extent they are appropriate

with regard to plaintiffs' other claims discussed below.

> B.   <u>Plaintiffs' Breach of Fiduciary Duty, Fraud, and Constructive Fraud Claims</u>

Plaintiffs first claim that the evidence presented at trial proves that Hynes breached the

fiduciary duty he owed to plaintiffs in his roles as a paid business advisor and partner in the OK

EDM joint venture. More specifically, plaintiffs assert in their post-trial briefing that Hynes

breached his duty to plaintiffs in four different ways throughout the course of the parties' business

relationship. First, plaintiffs claim that Hynes breached his duty to them by establishing OK

EDM's structure in the manner it was set forth in the parties' business plan. Second, plaintiffs

assert that Hynes breached his duty to plaintiffs by purchasing equipment on behalf of his

companies from Sac EDM and then having those companies lease that equipment back to Sac

EDM under the terms set forth in the parties' various equipment leases. Third, plaintiffs contend

that Hynes' actions with regard to the US Banc lease and subsequent deficiency judgment

breached his duty to plaintiffs. Finally, plaintiffs assert that Hynes breached his duty to them by

loaning Sac EDM funds through HAI d/b/a OK EDM in a manner that put defendants' interests

above those of plaintiffs' interests. In addition, plaintiffs assert that each of these instances also

gave rise to both fraud and constructive fraud.

1                    1.    Legal Standards

2                          a.    Breach of Fiduciary Duty

3           Under California law, a "fiduciary or confidential relationship may arise whenever

4    confidence is reposed by persons in the integrity and good faith of another.  If the latter

5    voluntarily accepts or assumes that confidence, he or she may not act so as to take advantage of

6    the others' interest without their knowledge or consent."  City of Atascadero v. Merrill Lynch,

7    Pierce, Fenner & Smith, Inc., 68 Cal. App. 4th 445, 483 (1998).  "The elements of a cause of

8    action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and

9    damage proximately caused by that breach."  Knox v. Dean, 205 Cal. App. 4th 417, 432 (2012).

10          "[E]xamples of relationships that impose a fiduciary obligation to act on behalf of and for

11   the benefit of another are 'a joint venture, a partnership, or an agency.'"  Cleveland v. Johnson,

12   209 Cal. App. 4th 1315, 1339 (2012) (quoting City of Hope National Medical Center v.

13   Genentech, Inc., 43 Cal. 4th 375, 386 (2008)).  However, "[t]hose categories are merely

14   illustrative of fiduciary relationships in which fiduciary duties are imposed by law."  City of Hope

15   National Medical Center, 43 Cal. 4th at 386.

16          Under California Corporation Code § 16404, a fiduciary relationship exists between

17   partners in a business partnership, which is defined as "an association of two or more persons to

18   carry on as co-owners a business for profit."  Id. § 16202(a).  It is well-settled that the existence

19   of a partnership is a question of fact.  Filippo Indus., Inc. v. Sun Ins. Co. of New York, 74 Cal.

20   App. 4th 1429, 1444 (1999).  No particular formalities are required to create a partnership, and

21   whether a partnership has been created may be inferred from the parties' conduct.  See Weiner v.

22   Fleischman, 54 Cal. 3d 476, 482-83 (1991) ("A joint venture or partnership may be formed orally

23   or assumed to have been organized from a reasonable deduction from the acts and declarations of

24   the parties.") (internal citations and quotation marks omitted); Bank of Cal. v. Connolly, 36 Cal.

25   App. 3d 350, 364 (1973) ("Whether a partnership . . . exists is primarily a factual question to be

26   determined by the trier of fact from the evidence and inferences to be drawn therefrom.").

27   Whether or not the parties have entered into a partnership relationship generally depends on

28   whether they intended to share in the profits, losses, and the management and control of the

enterprise.  See, e.g., Nelson v. Abraham, 29 Cal. 2d 745, 750 (1947) (noting that profit sharing is a factor in determining whether a partnership exists); Bank of California, 36 Cal. App. 3d at 364 (1973) (quoting Holtz v. United Plumbing & Heating Co., 49 Cal.2d 501, 506-07 (1957)) ("A joint venture exists where there is an 'agreement between the parties under which they have a community of interest, that is, joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control.' "); Billups v. Tiernan, 11 Cal. App. 3d 372, 379 (1970) (noting that some degree of participation in management and control of business is an element of partnership).

Under California law, partners to a partnership or joint venture owe certain duties to their fellow partners to the enterprise.  Cal. Corp. Code § 16404.  Among those duties is a duty of loyalty, which requires a partner to, among other things, "refrain from dealing with the partnership in the conduct . . . of the partnership business as or on behalf of a party having an interest adverse to the partnership."  Id. § 16404(b)(2).  "[U]nder an agreement calling for a division of profits, whether the contract is one of copartnership, joint venture, or employment, good faith and fair dealing require that neither party may be permitted to take an unfair advantage or enjoy greater rights than called for by the terms of the agreement."  Nelson v. Abraham, 29 Cal. 2d 745, 751 (1947).  Furthermore, a partner must "discharge [his] duties to the partnership and the other partners under [California law] or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing."  Id. § 16404(d).  However, "[a] partner does not violate a duty or obligation [owed under the statutory law] or under the partnership agreement merely because the partner's conduct furthers the partner's own interest."  Id. § 16404(e).

An agent owes a similar fiduciary duty of loyalty to his principal.  In particular, "[a]n agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."  Restatement (Third) Of Agency § 8.01 (2006).  As part of this duty of loyalty, "[a]n agent has a duty not to deal with the principal as or on behalf of an adverse party in a transaction connected with the agency relationship."  Id. § 8.03.  Nevertheless, conduct by an agent that would otherwise constitute a breach of his duty to not deal with the principal as or on

behalf of an adverse party

> does not constitute a breach of duty if the principal consents to the conduct, provided that (a) in obtaining the principal's consent, the agent (i) acts in good faith, (ii) discloses all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and (iii) otherwise deals fairly with the principal; and (b) the principal's consent concerns either a specific act or transaction, or acts or transactions of a specified type that could reasonably be expected to occur in the ordinary course of the agency relationship.

Id. § 8.06. The rule articulated in § 8.06 requires the agent to engage in "full and fair disclosure" of the material benefit he receives and requires the principal consent to either the specific transaction or the type of transaction that could be reasonably expected in the ordinary course of business. See id. § 8.06 cmt. c.[22]

### b. Fraud

The elements of a fraud claim under California law are: (1) misrepresentation of material fact (consisting of a false representation, concealment or nondisclosure); (2) knowledge of the falsity (or "scienter"); (3) intent to defraud, i.e., to deceive and induce reliance; (4) justifiable reliance on the misrepresentation; and (5) resulting damage. Lazar v. Superior Court, 12 Cal. 4th 631, 638 (1996). "[T]o establish a cause of action for fraud a plaintiff must plead and prove in full, factually and specifically, all of the elements of the cause of action." Conrad v. Bank of America, 45 Cal. App. 4th 133, 156 (1996). "The absence of any one of these required elements

---

[22] California law is in accord with the above general agency principals set forth in the Restatement (Third) Of Agency. See Cal. Civ. Code § 2306 ("An agent can never have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with whom he deals, to be a fraud upon the principal."); Gordon v. Beck, 196 Cal. 768, 773 (1925) (noting that "[t]he law will not tolerate" an agent acting on behalf of two principals, to the advantage of one principal and to the disadvantage of the other, "without the knowledge and consent of both principals"); Assilzadeh v. California Fed. Bank, 82 Cal. App. 4th 399, 415 (2000) ("The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud."); Baird v. Lascy, 71 Cal. App. 2d 142, 143 (1945) (citing Gordon, 196 Cal. 768) ("[W]here an agent assumes to act for two opposing parties without disclosing his dual capacity either party may repudiate and defend against the resulting contract as having been procured by constructive fraud.").

will preclude recovery."  <u>Wilhelm v. Pray, Price, Williams & Russell</u>, 186 Cal. App. 3d 1324, 1332 (1986).

c.      <u>Constructive Fraud</u>

To prove their claim for constructive fraud under California law, plaintiffs must demonstrate:  (1) the existence of a fiduciary or confidential relationship; (2) a misleading act, omission or concealment by defendants involving a breach of that duty; (3) reliance by plaintiffs; and (4) resulting damage to plaintiffs.  Cal. Civ. Code § 1573; <u>Dealertrack, Inc. v. Huber</u>, 460 F.Supp.2d 1177, 1183 (C.D. Cal. 2006); <u>Warren v. Merrill</u>, 143 Cal. App. 4th 96, 109 (2006) ("A constructive fraud arises on a breach of duty by one in a fiduciary relationship who misleads another to his prejudice.").  Thus, plaintiffs do not need to establish defendants' fraudulent intent to prove their constructive fraud claim as long as they have proven the parties are in a fiduciary or confidential relationship.  <u>Sandy v. McClure</u>, 676 F. Supp. 2d 866, 882 (N.D. Cal. 2009).  "The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud."  <u>Assilzadeh</u>, 82 Cal. App. 4th at 415.  "A careless misstatement may constitute constructive fraud even though there is no fraudulent intent."  <u>Id.</u>  "Most acts . . . in breach of [the fiduciary's] duties constitute constructive fraud."  <u>Id.</u>

2.      <u>Discussion</u>

a.      <u>Fraud</u>

As an initial matter, the court notes that plaintiffs in no way argue in their post-trial briefing why the preponderance of the evidence presented at trial demonstrates that Hynes, acting either individually or as a representative of HAI or Hynes Children, committed actual fraud. Instead, plaintiffs argue exclusively in their post-trial briefing that Hynes committed constructive fraud.  Plaintiffs cite to no evidence presented at trial showing that Hynes knowingly made a false representation, concealment, or nondisclosure with the intent to deceive either Dan Folk or Sac EDM into reliance at any point over the course of the OK EDM joint venture or the parties' other business dealings.  Indeed, a review of the evidence presented at trial confirms that plaintiffs failed to carry their burden to prove the third element necessary for a fraud claim, that defendants

39

knowingly made a misrepresentation with the intent to deceive. Accordingly, the court concludes that plaintiffs failed to prove their fraud claim to the extent it is asserted as a cause of action separate from their constructive fraud claim.

b.     <u>Breach of Fiduciary Duty and Constructive Fraud</u>

i.     <u>Existence of a Fiduciary Relationship</u>

The court finds that a preponderance of the evidence presented at trial demonstrates that a fiduciary relationship existed between Hynes and both Dan Folk and Sac EDM. With regard to Dan Folk, the facts show that both Dan Folk and Hynes were partners with regard to the OK EDM joint venture. The business agreement between the parties provided that both Dan Folk and Hynes were to receive salaries from managing and controlling the OK EDM enterprise and to share in the profits it received through Sac EDM's operations. All of these facts establish that a partnership was formed between Dan Folk and Hynes with regard to their operation of the OK EDM joint enterprise. Accordingly, the court concludes that plaintiffs have met their burden in establishing the existence of a fiduciary relationship between Dan Folk and Hynes.[23]

Similarly, the court concludes that plaintiffs have met their burden to prove that Hynes was in a fiduciary relationship with Sac EDM. The facts established at trial demonstrate that Hynes, in his role as Sac EDM's paid business consultant, acted as Sac EDM's agent throughout the course of the parties' business relationship. Hynes was paid by Sac EDM to act as its business consultant even prior to the formation of OK EDM and the parties' joint venture on January 1, 2004, and continued to act in that role throughout the course of the parties' business dealings. Furthermore, at least initially, the parties characterized the wages Hynes was drawing from Sac EDM as "W-2" wages, indicating the degree of closeness to Sac EDM's operations the parties intended him to have in his role as its business consultant. While the parties subsequently re-characterized the income Hynes drew from Sac EDM as "1099" wages, his role as a business consultant in relation to Sac EDM continued in the same fashion as it had before. In short, the

---

[23] Indeed, defendants acknowledge in their post-trial briefing that plaintiffs have established by a preponderance of the evidence that Hynes owed a fiduciary duty to Dan Folk with regard to their participation in the OK EDM joint venture. (ECF No. 146 at 35.)

court finds that a preponderance of the evidence demonstrates that the parties intended for Hynes to act as Sac EDM's agent in his role as its business consultant and that Sac EDM reposed its confidence in Hynes and trusted that he would act with integrity and in good faith in that role to ensure that his advice and actions taken with regard to and on behalf of Sac EDM were in that entity's best interests.

Accordingly, the court concludes that plaintiffs have met their burden of proof in showing that a fiduciary relationship existed between Hynes and plaintiffs.

ii.    <u>Breach</u>

(a)    <u>Creation of the OK EDM Joint Venture</u>

With regard to the establishment of the OK EDM joint venture, plaintiffs argue that the evidence shows that the only purpose behind setting up that venture in the manner Hynes did was to allow himself and HAI to take advantage of HAI's net operating loss carryforward deduction that was set to expire over the next two years. Plaintiffs contend that the evidence shows that the OK EDM joint venture provided no material advantage to Sac EDM or Dan Folk because Sac EDM had its own net operating loss carryforward that it could have used instead to similar effect. However, the court finds that plaintiffs have failed to offer evidence sufficient to prove that the creation and structure of OK EDM itself constituted a breach of Hynes' fiduciary duty to either plaintiff.[24]

With regard to Sac EDM, Hynes owed a duty of loyalty to it through his role as Sac EDM's paid business advisor and agent. In encouraging Sac EDM to enter into the OK EDM business structure as it was constituted by the terms of the business plan and accounting procedures he drafted, Hynes risked breaching that duty of loyalty to Sac EDM because that structure set up regular transactions, i.e., operational loans, with an adverse party that Hynes also represented, i.e., HAI d/b/a OK EDM. Nevertheless, the evidence presented at trial demonstrates that Hynes set forth all of the material details of the OK EDM joint venture, including key terms

---

[24] The parties' respective positions as to the benefits, if any, of HAI's net operating loss carryforward is completely unresolved because both parties did a woefully inadequate job of presenting any reliable evidence (such as testimony of a retained accounting expert) to address the relative merits or lack thereof to Sac EDM of any such loss carryforward.

41

regarding the provision of operating loans and their repayment, in the various business plan and accounting procedure documents the parties signed, and discussed those terms with Dan Folk prior to entering into the arrangement.  Accordingly, the court finds that Hynes, in obtaining Dan Folk's consent to the OK EDM joint venture, acted in good faith, disclosed all material facts regarding the joint venture's structure, and otherwise dealt fairly with Dan Folk and Sac EDM.  Therefore, the court finds that Hynes did not breach his duty of loyalty to Sac EDM in structuring the OK EDM joint venture as he did.[25]

The court finds further that Hynes also had Sac EDM's business interests in mind when he created the OK EDM joint venture, because a preponderance of the evidence shows that Sac EDM received a substantial benefit from the formation and operation of the OK EDM joint venture.  Indeed, the loans HAI advanced through OK EDM to Sac EDM to cover Sac EDM's operating costs as those costs arose almost entirely alleviated Sac EDM's short-term cash flow problems, because it ensured that Sac EDM would have sufficient funds to make payroll, purchase materials to fulfill its customers' orders, make its lease payments, and pay other bills as they became due, provided that Sac EDM's management decided to obtain and use the loans towards those ends.  Furthermore, OK EDM's structure permitted Sac EDM to obtain reimbursement from HAI d/b/a OK EDM on a monthly basis for all of its operational expenses.  Sac EDM was allowed to use those reimbursement funds to pay down any operating loans it took out from HAI d/b/a OK EDM over the course of a given month, and, ideally, it could have used that reimbursement to fully pay off those loans every month, therefore leaving Sac EDM with no loan balance and all of its expenses paid in full at the end of every month.

A preponderance of the evidence demonstrates that by the time Hynes was hired as a consultant and the parties agreed to enter into the joint venture, Sac EDM had dire cash flow issues that created uncertainty as to whether it had sufficient funds to make payroll each month, left it on the brink of default with regard to its equipment lease with US Banc, and created a real

---

[25] However, virtually all of Hynes' dealings were with Dan Folk, and as the self-proclaimed business "expert," Hynes should have ensured that corporate formalities were followed and the Sac EDM corporation actually approved his recommendations.

potential that it would have to declare bankruptcy in the near future.  The evidence also shows that Sac EDM was having difficulties with obtaining loans or other financing from banks and other sources, even after Hynes was hired as its consultant and made attempts to obtain such outside financing for Sac EDM.  While Hynes stood to personally gain financially under the plan through his profit sharing with Dan Folk and his ability to take advantage of HAI's tax loss carryforward, he would only realize that gain if Sac EDM's operations were successful because he would receive no profit sharing if the OK EDM joint venture had no profits to share (which were derived solely from Sac EDM's operations) and could not use HAI's tax loss carryforward if OK EDM had no positive income to which it could be applied.

Similarly, while Hynes and HAI stood to gain some profit from the arrangement through any interest collected on the operating loans, they still had to make significant cash outlays to Sac EDM, which posed a real risk of non-payment in the event that Sac EDM's operations did not bring in sufficient profits, or if Sac EDM decided to not use the funds it received from HAI d/b/a OK EDM through its monthly invoices for expenses toward paying back those loans.  Moreover, the mere extension of the loans themselves to other participants in the OK EDM joint venture did not, by itself, constitute a breach of any duties Hynes owed to Dan Folk by virtue of his role as a partner in the joint venture.  Pursuant to California Corporations Code § 16404, which sets forth certain fiduciary duties owed by partners in a business partnership to the partnership and the other partners, "[a] partner may lend money to and transact other business with the partnership, and as to each loan or transaction, the rights and obligations of the partner regarding performance or enforcement are the same as those of a person who is not a partner, subject to other applicable law."  Cal. Corp. Code § 16404(f).  Furthermore, the interest rate on the operating loans, at 9.5 percent, was not excessive under the circumstances presented by the evidence as the court finds that it was similar to the rates on the loans Hynes and HAI themselves allegedly had to take out at times from third parties in order to ensure that Sac EDM had continuous access to a pool of operating funds through the OK EDM joint venture.

////

////

43

Even if, in practice, Sac EDM ended up taking on more loans than it paid back, the circumstances make clear that Hynes devised the OK EDM joint venture in order to advance both Sac EDM's and Dan Folk's business interests and provide Sac EDM with sufficient operating capital at any given time such that it could pay its operating expenses as they became due. He also regularly informed Dan Folk, Sac EDM's president, of the financial risks Sac EDM would face if it decided to use the operating loans extended to it for purely operational purposes and/or did not use its monthly reimbursement from OK EDM to pay down those loans. Plaintiffs' decision at times to either use portions of the operating loans for non-operations related purposes, or to not pay down the outstanding monthly loan balance, does not mean that the entire OK EDM structure as Hynes had devised it was misleadingly disadvantageous to plaintiffs and advantageous only to defendants.[26]

In short, the court finds that the evidence presented at trial establishes that the structure of the OK EDM joint venture as it was proposed and implemented by Hynes was designed to advance the business interests of, and provide substantial advantages to, both Hynes and plaintiffs. The court also concludes that Hynes clearly informed plaintiffs of the material details of how the joint venture was to be operated, and regularly articulated the potential pitfalls plaintiffs would face if they did not follow the parties' business plan as it had been envisioned.[27] Accordingly, the court finds that Hynes did not breach his fiduciary duty to either plaintiff by advising plaintiffs to enter into and operating the OK EDM joint venture as he had structured it.[28]

---

[26] Admittedly, the court has significant concerns in that Hynes was profiting as a paid consultant, lender, and partner, however, plaintiffs have not met their burden of proof that such structure itself was improper.

[27] The court is also concerned that on a number of occasions the "business plan" was unilaterally revised by Hynes, then signed by Dan Folk, almost always to benefit Hynes, but without better evidence the court cannot conclude that those plans violated Hynes' fiduciary duty.

[28] The court notes that plaintiffs' case would very likely have benefited from the testimony of an expert witness regarding the potential tax and other financial implications of the OK EDM joint venture's structure and the parties' various business dealings under that structure, as it would have greatly assisted the court in determining whether a given business plan or agreement between the parties that Hynes drafted was actually beneficial to plaintiffs and their operations. However, no such testimony was given at trial. Accordingly, given the evidence that is before it,

44

1        (b)     Equipment Leases

2        With regard to the equipment leases, plaintiffs argue that Hynes breached his duty to

3 plaintiffs by purchasing certain equipment Sac EDM already owned outright in order to lease that

4 equipment back to it under contractual terms that were clearly favorable to Hynes and his

5 companies and unfavorable to plaintiffs.  In particular, plaintiffs argue that the evidence presented

6 at trial shows that the interest rates Hynes misleadingly attached to the leases exceeded the lawful

7 rate allowed to be charged under Missouri law, which governs those agreements.  Plaintiffs argue

8 further that the lack of a definite lease term and the onerous buyback provisions of the leases also

9 highlight the fact that Hynes encouraged Sac EDM in his role as its business consultant to enter

10 into the contracts for the purpose of benefitting his own companies' financial interests without

11 any consideration for the consequences to his client.  Based on a preponderance of the evidence,

12 the court agrees with plaintiffs' assertions regarding certain provisions contained in the lease

13 agreements and concludes that Hynes' advice and insistence that the parties agree to such terms

14 constituted not only a breach of the duties he owed to plaintiffs as a fiduciary, but also

15 constructive fraud.

16        Addressing the interest term on each of the leases, while Hynes initially represented to

17 Dan Folk and Sac EDM that the additional charge calculated into each monthly lease payment

18 consisted of 10 percent interest added on to each payment, he later, after Dan Folk had already

19 signed the master lease agreements on Sac EDM's behalf, described that charge as consisting of

20 10 percent interest, 10 percent "overhead," and 10 percent "profit," (Exh. 150; Tr. 954-55), an

21 effective interest rate of 30 percent on each monthly lease payment.  The evidence demonstrates

22 that Hynes, acting on behalf of both HAI and Hynes Children, while also acting as a fiduciary to

23 Sac EDM and Dan Folk, represented to plaintiffs, in encouraging them to have Sac EDM enter

24 into the leases, that the effective interest rate on each lease was only 10 percent, and was less

25 onerous than the interest terms contained in lease contracts Sac EDM had previously entered into

26

27 the court finds that the business plan Hynes had the parties enter into via the creation of OK EDM
   was structured in a manner that created a reasonable opportunity for substantial benefit to both
28 Sac EDM and Dan Folk, regardless of whether they actually realized that opportunity.

45

with third parties.  In fact, it was actually 30 percent, and much higher than the interest attached to most of Sac EDM's leases with third parties.

While Hynes testified at trial that the additional charges were added to each payment to cover defendants' overhead and fees in connection with obtaining the funds they needed to purchase the equipment to be leased, the court finds that a preponderance of the evidence demonstrates that the fees defendants incurred in obtaining those funds were generally small, one-time charges, and that their overhead in maintaining the leases was, at most, minimal, and nowhere near the percentage charged under the lease to cover that expense.  Accordingly, the court concludes that the bulk of the 30 percent fee on each monthly payment under the leases was principally realized as profit to defendants, and resulted in an effective interest rate of well over the 10 percent Hynes represented to plaintiffs when they entered into the lease contracts.

Furthermore, under Missouri Law, which the parties agreed would govern each of the equipment leases at issue, "[p]arties may agree, in writing, to a rate of interest not exceeding ten percent per annum on money due or to become due upon any contract . . . except that, when the 'market rate' exceeds ten percent per annum, parties may agree, in writing, to a rate of interest not exceeding the 'market rate.'"  Mo. Ann. Stat. § 408.030.  Here, the 30 percent interest rate Hynes factored into the monthly lease rate in the written equipment leases well exceeded the 10 percent maximum contemplated by Missouri law.  Furthermore, defendants presented no credible evidence at trial proving that the market rate regarding such leases was 30 percent or more.[29] Accordingly, the court concludes that not only did Hynes misrepresent to plaintiffs the amount of interest attached to each of the lease payments, but the actual rate he had his companies charge in that regard was usurious under the law controlling each lease contract.

////

////

---

[29] While Hynes testified at trial, and claimed in several of his memoranda, that Sac EDM had other equipment leases with third parties that effectively charged interest rates higher than the 30 percent charged under the parties' agreements, the court finds that evidence wholly incredible, especially in light of the other evidence in the record demonstrating Hynes' own admission that the lease rates for equipment Sac EDM leased from third parties were lower than 30 percent.

In addition to being at a usurious rate, the 30 percent interest charged each month also violated the terms of the parties' business plan regarding the OK EDM joint venture. The parties' initial business agreement regarding the OK EDM joint venture, which was drafted by Hynes, and signed by the parties on January 4, 2004, stated that "where possible all [of Sac EDM's] equipment leases w[ould] be re-negotiated in the name of [OK EDM] with lower interest rates, longer terms, and more favorable purchase options, or the existing equipment would be replaced to accomplish the same goals (lower interest costs, better cash flow, and some equity gain)." (Exh. 11.) This term of the parties' agreement remained consistent throughout all of their subsequent revisions to the business plan. (Exhs. 11, 17, 18, 19, 55, 58.) Accordingly, the 30 percent interest rate, which was higher than the rates in Sac EDM's leases with third parties, ran contrary to this provision.

Defendants argue in their post-trial briefing that the evidence establishes that the effective rate of interest that Sac EDM had actually paid to defendants under the leases over the course of time at issue was only 6.5 percent because defendants had allowed it to make reduced monthly payments at times, and Sac EDM eventually stopped paying altogether but still enjoyed the use of the leased equipment. While the evidence does prove that Hynes agreed to lower Sac EDM's monthly payments for certain periods, and that Sac EDM continued to use the equipment after it stopped making lease payments, those facts do not mean that Sac EDM was not to be held ultimately responsible for paying the 30 percent in interest under the terms of the lease agreements (or the fact that Hynes breached his fiduciary obligations in initially demanding 30%). Moreover, the equipment lease agreements did not set forth a definite lease period. Instead, the parties agreed that 50 percent of Sac EDM's lease payments would be credited towards purchasing the leased equipment, and that Sac EDM could purchase the leased equipment once the credited amount reached the price defendants paid to purchase the leased equipment plus 10 percent. This agreement meant that any reduction in payment or non-payment on the leases in any given month would only prolong the life of the leases, provided that defendants did not seek to declare the leases in default, thus still obligating Sac EDM to pay the full 30 percent interest charge before the leases would terminate. Moreover, if defendants were to

declare a default based on any reduction in payment or nonpayment by Sac EDM, the terms of the leases provide that the lessor would be entitled to the sum of all payments then due, all future payments that would accrue over the course of the lease term, and any other costs or expenses incurred as a result of Sac EDM's breach of its payment obligations, which would include the full 30 percent interest.[30] While Sac EDM benefitted from using the leased equipment at the reduced rates during the months defendants accepted reduced payments, it was still ultimately required to pay out the full buyout amount for each item as it was initially set forth in the master contracts. Accordingly, defendants' argument that the actual interest rate charged to Sac EDM under each lease was effectively less than 30 percent lacks merit.

With regard to the lease periods, a preponderance of the evidence shows that Hynes represented to Dan Folk and Sac EDM that he drafted each equipment lease and calculated their payment amounts with the contemplation that each lease would conclude after 60 months of full payments because Sac EDM would be able to exercise its purchase option. However, the way those payments were calculated and the terms of Sac EDM's purchase option, i.e., the fact that Sac EDM could apply only 50 percent of each lease payment towards the buyout price of cost plus 10 percent, would have required Sac EDM to make far more than 60 monthly lease payments before the lease term for a given lease would conclude. Indeed, the calculation method Hynes used to determine the monthly payments meant that Sac EDM would need to make nearly 102 months' worth of payments at the rate Hynes initially calculated with respect to each lease in order to exercise its right to purchase the equipment under the lease terms, and thus end the otherwise open-ended lease period.[31] Such a lease schedule would result in the lessor receiving a

---

[30] Perhaps in recognition of this fact, Hynes' and HAI's damages calculation based on their counterclaims premised on Sac EDM's default of its monthly payment obligations under the equipment leases includes the full 30 percent interest.

[31] For instance, Hynes testified at trial that the purchase price of the group of office equipment and furnishings listed in attachment one to the August 1, 2004 master lease was $6,000. (Tr. 1375.) Accordingly, Hynes calculated the monthly lease payment at $130 (($6000 [cost] / 60 [months]) + $30 [30 percent] = $130). Because Sac EDM could apply only 50 percent of each lease payment ($65) towards the purchase price of $6,600 (cost + 10 percent), it would have needed to make just under 102 months' worth of full payments of $130 to be able to exercise its purchase option.

48

total payment by the end of the lease period amounting to more than double the initial purchase price.[32]

Hynes added a surcharge amounting to 30 percent, a usurious rate under the applicable Missouri law and contrary to the contract creating the OK EDM joint venture, onto each monthly payment and then characterized after the fact that each of the surcharges amounted to only 10 percent interest. Hynes also indicated to Dan Folk and Sac EDM that the lease buyout terms were 60 months long when they, by their natural operation, were to last substantially longer. Accordingly, Hynes, acting both in his role as a business consultant to Sac EDM and partner to Dan Folk in the parties' joint venture, mischaracterized the terms of the lease agreements in a manner that not only constituted a breach of his fiduciary duty to both plaintiffs, but also constructive fraud.

First, as an agent of Sac EDM, Hynes breached his duty of loyalty by drafting and encouraging Dan Folk, acting on behalf of Sac EDM, to enter into the lease agreements that ultimately would have profited Hynes' own companies at Sac EDM's expense. The fact that Dan Folk accepted the terms of those agreements despite his knowledge that defendants stood on the other side of Sac EDM regarding the leases did not cure the breach of Hynes' duty of loyalty, because Hynes misrepresented the rate of interest associated with, and duration of, those leases.[33] Similarly, Hynes' misrepresentations regarding the leases' terms also violated his duty of loyalty to Dan Folk as a partner to the OK EDM joint venture. Bardis v. Oates, 119 Cal. App. 4th 1, 12 (2004) ("'Partners are trustees for each other, and in all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his copartner and may

---

[32] For instance, with regard to the group of office equipment and furnishings, which was initially purchased from Sac EDM for $6,000, the lessor would receive $13,200 in total by the time the 50 percent of lease payments that could be applied towards purchase amounted to the buyout price of cost plus 10 percent.

[33] Furthermore, even if Dan Folk knew the effective rate, Hynes was taking advantage of Dan Folk and Sac EDM to his own benefit because Hynes believed they had no other options, and, acting in his role as Sac EDM's paid business consultant, expressed that belief to Dan Folk on numerous occasions prior to having Sac EDM enter into leases and other financial arrangements with his companies.

49

1    not obtain any advantage over him in the partnership affairs by the slightest misrepresentation,

2    concealment, threat or adverse pressure of any kind.' [Citations.]  Moreover, this duty extends to

3    all aspects of the relationship and all transactions between the partners.'"); see also Enea v.

4    Superior Court, 132 Cal. App. 4th 1559, 1564 (2005).

5           In addition to constituting a breach of his duty of loyalty to both plaintiffs, Hynes'

6    misrepresentations regarding the leases' terms were also acts of constructive fraud because

7    Hynes, a purported expert in business finance and longtime owner and executive of a company

8    that regularly leased aviation-related equipment, either knew or should have known that the

9    interest and duration terms he represented to plaintiffs were contained in the leases at the time the

10   parties entered into them reflected neither the true interest calculated into the monthly payments

11   nor the leases' actual duration.[34]  See Assilzadeh, 82 Cal. App. 4th at 415.

12          In addition to concluding that Hynes both breached his fiduciary duty of loyalty and

13   committed constructive fraud with regard to his misrepresentations concerning the interest and

14   duration terms of the equipment leases, the court also concludes that those terms are

15   unconscionable as a matter of law at the time they were made.  See Langemeier v. Nat'l Oats Co.,

16   775 F.2d 975, 977 (8th Cir. 1985) (holding that U.C.C. § 2-302, which Missouri has adopted

17   verbatim via Missouri Revised Statute § 400.2-302, permits a court to raise the issue of

18   unconscionability of a contract *sua sponte*).[35]

19          Under applicable Missouri law, a contract's term may be deemed invalid when there is

20   both procedural and substantive unconscionability.  Funding Sys. Leasing Corp. v. King Louie

21

22   [34] As noted above with regard to plaintiffs' fraud claim, the court concludes that plaintiffs offered insufficient evidence at trial to demonstrate that Hynes acted with the intent to deceive necessary

23   to support a claim for actual fraud.  However, the court also concludes that there exists evidence sufficient to meet plaintiffs' burden to prove that Hynes, acting as a fiduciary to both plaintiffs

24   and as a purported expert on the subject matter of business finance, made multiple negligent misrepresentations to plaintiffs that induced Dan Folk to sign the leases on Sac EDM's behalf to

25   Sac EDM's detriment.

26   [35] While the language of U.C.C. § 2A-108, which Missouri has also adopted via Missouri Revised

27   Statute § 400.2A-108, addresses specifically the issue of unconscionability in the context of lease contracts, the language of that provision operates in the same fashion as U.C.C. § 2-302 when a

28   court raises the issue of unconscionability.

Int'l, Inc., 597 S.W.2d 624, 634-35 (Mo. App. 1979). Procedural unconscionability arises during the contracting process when there is fine print in the contract, there has been some misrepresentation, or there is unequal bargaining power. World Enterprises, Inc. v. Midcoast Aviation Servs., Inc., 713 S.W.2d 606 (Mo. App. 1986). Substantive unconscionability, on the other hand, occurs when the contractual terms are unduly harsh. Id.; Lyster v. Ryan's Family Steak Houses, Inc., 239 F.3d 943 (8th Cir. 2001). Provisions that an objective reasonable person would find unexpected and unconscionably unfair are unenforceable. Hartland Computer Leasing Corp., Inc. v. Insurance Man, Inc., 770 S.W.2d 525, 527-28 (Mo. App. 1989). Procedural and substantive unconscionability are considered on a sliding scale, so that when more substantive unconscionability is present less procedural unconscionability is necessary to invalidate a contract and vice versa. Funding Sys. Leasing Corp., 597 S.W.2d at 634-45.

Here, procedural unconscionability arose when Hynes misrepresented the lease contracts' terms regarding the rate of interest being charged and the lease period. Furthermore, the leases' terms with regard to interest and duration are also substantively unconscionable as they are unduly harsh. As discussed above, the 30 percent interest added on to each month's payment is usurious under the applicable Missouri law, which allows for only 10 percent interest under the circumstances. Similarly, the actual duration of each lease is nearly twice as long as Hynes represented they would be, and would result in Sac EDM paying more than double what defendants paid for each piece of equipment, including the equipment that Sac EDM had owned outright prior to the sale, before it could finally buyout that equipment and conclude the lease term if it were to follow the payment schedule contemplated in the terms of each lease agreement. Such a lease term was both contrary to the parties' intentions and goals set forth in their business plan, which was to obtain more favorable lease terms for Sac EDM, and was structured in such a fashion as to clearly benefit defendants to the long-term detriment of Sac EDM.[36] Finally, Sac EDM could apply only 50 percent of its lease payments towards its purchase of the equipment, a substantial portion of which was equipment that it had previously owned outright. This fact not

_____

[36] All of these terms were in addition to Hynes still receiving consulting fees from Sac EDM as part of OK EDM and sharing in the profits.

only substantially increased the overall duration of each lease, but also ensured that Sac EDM would have paid more than double defendants' purchase cost for that equipment by the time it could exercise its purchase option. Such a term is entirely contrary to the provisions of the parties' agreement and business plan regarding the operation of the OK EDM joint venture that stated that defendants were to obtain more favorable purchase options with regard to any equipment Sac EDM leased.[37] Accordingly, the court concludes that the interest, duration, and purchase terms of the leases are unconscionable.[38]

(c)    <u>US Banc Judgment</u>

With regard to Hynes' actions pertaining to the US Banc judgment, plaintiffs argue in their post-trial briefing that Hynes breached his duty to plaintiffs in two ways. First, plaintiffs contend that the evidence shows that Hynes breached his duty to plaintiffs by channeling the profits Sac EDM made from its operations into the OK EDM bank account and withholding those profits from Sac EDM such that Sac EDM could not use them to pay what it owed under the US Banc lease. Second, plaintiffs argue that the evidence shows that Hynes' purchase of the US Banc judgment in the name of HAI and his subsequent efforts to enforce the entire amount of the judgment against Sac EDM were a breach of his fiduciary duty.

Based on a preponderance of the credible evidence, the court finds that the OK EDM venture was structured such that Sac EDM could obtain loans from OK EDM to cover its operating expenses, which included its monthly lease payments for the equipment leased from US Banc, and could seek full reimbursement of those expenses from OK EDM at the end of each month. Because the joint venture's business structure as Hynes had devised it still left Sac EDM with the ability to make its lease payments to US Banc even though all of its accounts receivable were being diverted to and held by OK EDM, the court finds plaintiffs' argument that Hynes

---

[37] The court finds that the provision limiting Sac EDM from applying any more than 50 percent of its lease payments towards purchase is particularly egregious with regard to the equipment that defendants purchased from Sac EDM and leased back.

[38] The court finds that defendants have offered no credible evidence that Sac EDM's equipment leases with third parties for similar equipment had more onerous provisions regarding interest, duration, and/or the purchase of leased equipment.

breached his fiduciary duty by structuring the OK EDM joint venture in a manner that prevented Sac EDM from making those lease payments to lack merit.

However, while the court concludes that plaintiffs' first asserted basis for finding that Hynes breached his fiduciary duty lacks merit, it finds that plaintiffs have established by a preponderance of the evidence that Hynes breached the duty of loyalty he owed to both plaintiffs when he purchased the US Banc judgment and then sought to pursue the entire amount of that judgment against plaintiffs on top of charging the Folks for the amount he paid to purchase that judgment plus interest. The credible evidence presented at trial demonstrates that the initial plan Hynes proposed, and that plaintiffs accepted, was to have Sac EDM stipulate with US Banc to enter a judgment for the full amount US Banc claimed was owing. Then Hynes, acting in his roles as Sac EDM's paid agent/advisor, president of HAI, and partner in the OK EDM joint venture, would negotiate with US Banc to have HAI purchase the judgment for a steeply reduced amount. The parties agreed further that whatever amount HAI paid to purchase the judgment would be treated as a debt to be paid by the Folks personally on Sac EDM's behalf with an interest rate of eight percent per annum, and that once that full amount was paid off, whichever of Hynes' companies held the judgment at that time would deem it fully satisfied. The parties agreed that the Folks, not Sac EDM, would pay the debt because they would soon be able to pay off that debt in full through a lump sum payment from the proceeds of the sale of their personal home, and because such an arrangement would further improve Sac EDM's cash flow. The parties also contemplated that the Folks would eventually be able to obtain full reimbursement from Sac EDM for their payment on its behalf in satisfaction of the US Banc judgment by treating that payment as a loan to Sac EDM that Sac EDM could pay back over time.

The court finds that had Hynes observed this initial agreement regarding the US Banc judgment, he would not have breached his duty of loyalty he owed to Sac EDM as its agent because, while Sac EDM was a beneficiary of that arrangement, neither Hynes nor his companies actually dealt with that entity in an adverse fashion pursuant to the agreement because the debt was to be owed by the Folks as individuals. Furthermore, such an agreement would not have breached Hynes' duty owed to Dan Folk as a partner in the OK EDM joint venture. California

53

Corporations Code § 16404(f) permits partners to extend loans and transact business with other partners and the partnership itself in the same fashion an outside lender is permitted to conduct such business. The terms of the $50,000 loan made to the Folks pursuant to the parties' arrangement comported with this standard and, therefore, would not have resulted in a breach of Hynes' duty of loyalty.

However, the evidence demonstrates further that after Hynes purchased the judgment and charged the Folks for the $50,000 he paid to make that purchase, he convinced Dan Folk to enter into a second agreement whereby Sac EDM would agree to assume liability for the entirety of the outstanding $283,473.77 plus interest it owed under the US Banc judgment, and Dan Folk would personally receive a lump sum of the second half of all payments Sac EDM made on that judgment after the judgment had been paid in full. The second agreement also made Dan Folk personally guarantee the full amount of the outstanding judgment and kept in place his obligation to pay back the $50,000 Hynes paid to purchase the judgment plus interest. In addition, Hynes later determined that Sac EDM could not seek reimbursement for any monthly payments it made towards the total US Banc judgment, thereby effectively rendering Sac EDM unable to make monthly payments using its own then-incoming profits since all of its income from its customers at that time was going to HAI d/b/a OK EDM.

By inducing Dan Folk to agree to these additional terms, Hynes breached the duty of loyalty he owed to both plaintiffs and engaged in constructive fraud. First, Hynes' addition of the term requiring Sac EDM to assume an obligation to repay the entirety of the US Banc judgment plus interest even after the Folks paid back the $50,000 plus interest loan was a clear breach of Hynes' fiduciary duty of loyalty to that entity. Under that term, Hynes and his companies stood to massively profit as it ensured that they would receive a revenue stream that would ultimately result in the judgment's holder receiving a profit many times larger than the $50,000 purchase price, while Sac EDM, which Hynes was also representing in the transaction, stood to only lose in relation to the parties' prior agreement. This clear instance of self-dealing violated Hynes' duty to not act as an adverse party in relation to a transaction in which Sac EDM was involved.

////

54

Furthermore, the court concludes that the mere fact that Dan Folk signed off on the second agreement did not remedy Hynes' breach under the circumstances. Even more troubling to the court than Hynes' recommendation that Sac EDM enter into the second agreement is the fact that, in order to obtain Dan Folk's consent to that agreement, Hynes appealed to Dan Folk's personal financial interest to the clear detriment of Sac EDM's financial interests.[39] The court finds that by highlighting the personal financial gain Dan Folk would obtain under the arrangement, Hynes acted in a misleading manner with regard to obtaining Dan Folk's consent on behalf of Sac EDM. Accordingly, the court finds that Hynes not only breached his duty of loyalty to Sac EDM as its agent, but also committed constructive fraud.

Similarly, Hynes' inclusion of Dan Folk's personal guarantee of the debt into the second agreement breached the duty of loyalty he owed to Dan Folk as a partner in the OK EDM joint venture. The evidence demonstrates that after the parties had entered into the second agreement, Hynes determined that Sac EDM could not invoice the monthly payments it was obligated to repay under that agreement as part of its monthly operating expenses pursuant to the terms of the OK EDM joint venture because Hynes saw that debt as arising prior to January 1, 2004. At the time the parties entered into the second agreement, Sac EDM was sending all of its income from its work to OK EDM, and therefore had no income with which to pay down the US Banc judgment absent taking on loans from defendants at a similar interest rate. In the event of Sac EDM's default on the US Banc judgment payments, Dan Folk would be held to personally pay that debt.[40] Defendants presented no credible evidence at trial demonstrating that Hynes advised Dan Folk that he would not consider the US Banc judgment payments as Sac EDM operating expenses for purposes of reimbursement at the time the parties entered into the second agreement. Accordingly, the court concludes that Hynes' inclusion of the personal guarantee in the second

---

[39] While the court acknowledges that Dan Folk's liability to Sac EDM is not at issue in this action, it is deeply troubled by the fact that Dan Folk would agree to enter into such an arrangement to the clear detriment of his own company's financial interests.

[40] Such an arrangement was clearly contrary to what Hynes knew was a reason for the Folks previous filing of bankruptcy so that they would not have any personal liability for the US Banc indebtedness.

agreement without full disclosure of all of the material facts regarding the circumstances concerning that agreement was inconsistent with his obligation of good faith and fair dealing with regard to Dan Folk, his partner in the OK EDM joint venture. See Cal. Corp. Code § 16404(d) ("A partner shall discharge the duties to the partnership and the other partners under this chapter or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing.").

(d)     Operating Loans

Finally, plaintiffs contend that Hynes breached his fiduciary duty with regard to the operating loans HAI d/b/a OK EDM provided to Sac EDM pursuant to the parties' business plan. Specifically, plaintiffs argue in their post-trial briefing that the evidence shows that Hynes structured the OK EDM joint venture such that it prevented Sac EDM from accessing the profits it made from its own operations to fund its further operations, therefore making it reliant on the loans provided by HAI through the OK EDM joint venture. Plaintiffs argue further that the parties' business agreement provided that HAI was to use withheld profits to make down payments on equipment to be purchased or leased by defendants for Sac EDM's use and to fund Sac EDM's operations, but that Hynes and HAI instead used those funds to loan Sac EDM money that it had to pay back with interest. The court finds that the evidence presented at trial does not meet plaintiffs' burden of proof.

Under the terms of the parties' joint venture agreement, all of Sac EDM's income was to be directed to HAI d/b/a OK EDM, and Sac EDM was to fund its week-to-week operations through loans it sought and obtained from HAI d/b/a OK EDM. Sac EDM was also entitled to seek full reimbursement from HAI d/b/a OK EDM for its operating expenses at the end of each month. HAI d/b/a OK EDM's payment to Sac EDM came from the pool of funds it was holding, which included Sac EDM's income from its operations channeled to HAI d/b/a OK EDM. Sac EDM was permitted to use that payment to repay its loans obtained from HAI d/b/a OK EDM throughout the course of the month. While this procedure fashioned by the parties' business plan resulted in a roundabout way of providing Sac EDM with some of its own income to pay for its operations and gave rise to a risk that Sac EDM would incur additional debts to OK EDM if it did

not use its operational reimbursement funds regularly for the purpose of paying off the operational loans, the OK EDM business structure and the loans advanced to Sac EDM via that structure provided significant business advantages to that entity such that Hynes did not breach his fiduciary duty of loyalty to Sac EDM or Dan Folk in recommending and implementing that plan.

First, Sac EDM operated on an accrual basis, meaning that while it could realize income for accounting purposes once it billed a customer, it would not receive the actual money for that bill until the customer paid in full. Although, prior to the establishment of the OK EDM joint venture and the availability of the loans HAI provided through that venture, Sac EDM received income that, on paper, it could use freely, the evidence establishes that Sac EDM also had extreme cash flow issues that posed a genuine risk to its ability to pay its regular operating expenses and precluded it from obtaining outside funding. The terms of the business plan allowed Sac EDM to take out operating loans to pay its short-term operating expenses as they arose and then receive full reimbursement for its operating expenses that could be applied towards those loans to essentially "zero out" the entire balance of the loans and, in a way, fully cover Sac EDM's monthly operating expenses in a manner similar to if it had used its own income prior to the formation of OK EDM. Accordingly, the court finds that plaintiffs' argument that OK EDM's provision of loans prevented Sac EDM from paying its operating expenses to the advantage of Hynes and HAI is unsupported by the evidence.

Second, in addition to Sac EDM's income, OK EDM was funded by other monies that HAI and Hynes provided, at times obtained through loans they had to take out themselves. The evidence introduced at trial demonstrates that HAI d/b/a OK EDM had to dip into these additional funds or obtain further outside loans for itself at times throughout the course of the parties' joint venture when Sac EDM's expenses outpaced the money coming in. Nevertheless, even during such times, Sac EDM was still permitted to seek full reimbursement of its expenses from HAI d/b/a OK EDM on a monthly basis. This aspect of the parties' business relationship provided Sac EDM with a substantial benefit because it effectively allowed Sac EDM access to operating capital well beyond what it would have been able to access outside of the lending scheme Hynes

1    established.

2         Moreover, unlike with regard to the terms of the lease agreements and payment of the US

3    Banc judgment, the evidence offered at trial does not prove that Hynes made any misstatements,

4    or otherwise acted in a misleading manner, with regard to the terms of the operating loans Sac

5    EDM had access to under the OK EDM joint venture business plan.  To the contrary, that

6    business plan and its subsequent revisions, all of which were drafted by Hynes for the purpose of

7    reflecting the parties' understanding as to the terms of the parties' business relationship under the

8    OK EDM joint venture, set forth the key terms of the parties' agreement regarding the provision

9    of operating loans and their repayment.[41]  Furthermore, the evidence reflecting the parties'

10   subsequent conduct with regard to the provision and repayment of those loans shows that HAI, at

11   Hynes' direction, allowed for a reduction in Sac EDM's monthly payments on the outstanding

12   balance of the operating loans at times throughout the parties' business relationship in order to

13   free up additional cash flow for Sac EDM's operations.

14        In short, the evidence presented at trial demonstrates that Hynes' implementation of the

15   operating loan scheme provided a substantial business advantage to Sac EDM's operations, did

16   not mislead either plaintiff as to the loans' terms, and generally was in Sac EDM's best interests.

17   The fact that Dan Folk willingly entered into such an arrangement by signing the parties' business

18   plans on Sac EDM's behalf, despite knowing all of the material terms regarding the provision of

19   operating loans and that HAI was on the other side of the loan arrangement and stood to

20   potentially gain from it through accrued interest, means that no breach of Hynes' duty of loyalty

21   occurred under the circumstances.  Accordingly, the court concludes that there was no breach of

22   fiduciary duty with regard to HAI's advancement of operating loans to Sac EDM.  Thus, the court

23   also concludes that there was no constructive fraud with regard to HAI's advancement of

24   operating loans to Sac EDM.

25   ////

26   _____

[41] Admittedly some of the dates of the revisions and terms therein appear confusing, if not
27   contradictory, but other than Dan Folk testifying that he now doesn't know what some of those
     terms mean, plaintiffs did not introduce any reliable evidence that they didn't understand the
28   documents when signing them.

iii.     Damages and Other Remedies

The measure of damages for a breach of fiduciary duty resulting in constructive fraud "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." Cal. Civ. Code § 3333; see also Pepitone v. Russo, 64 Cal. App. 3d 685, 688 (1976) ("[F]raudulent breach of duty is a tort, and the faithless fiduciary is obligated to make good the full amount of the loss of which his breach of faith is a cause."); In re Roussos, 251 B.R. 86, 93 (B.A.P. 9th Cir. 2000), aff'd, 33 F. App'x 365 (9th Cir. 2002) (noting that "the injured party is given the benefit of his bargain" when a fraudulent breach of duty has occurred). "Remedies for a breach of fiduciary duty include damages for all harm proximately caused to the corporation, as well as rescission and restitution." In re Intelligent Direct Mktg., 518 B.R. 579, 589 (E.D. Cal. 2014) (quoting In re GSM Wireless, Inc., 2013 WL 4017123, at *41 (Bankr. C.D. Cal. Apr. 5, 2013)); see also Hicks v. Clayton, 67 Cal. App. 3d 251, 264 (1977) ("Where a breach of fiduciary duty occurs, a variety of equitable remedies are available, including imposition of a constructive trust, rescission, and restitution, as well as incidental damages.").

With regard to the equipment leases, plaintiffs argue in their post-trial briefing that they are entitled to statutory damages pursuant to Missouri Revised Statute § 408.030, amounting to double the amount of interest they paid to defendants in excess of the 10 percent interest permitted under that statute. However, plaintiffs have not pleaded a separate claim under that statute with regard to the interest defendants charged Sac EDM under the leases. Rather, plaintiffs' only claims as to the interest charged under the leases are their breach of fiduciary duty and fraud claims. Accordingly, plaintiffs cannot now seek to recover damages based on an entirely separate statutory claim that they have not previously raised in their pleadings.

Nevertheless, plaintiffs are entitled to the full amount of their loss for which Hynes' breach of duty and constructive fraud is the cause. Here, Hynes misrepresented that the equipment leases at issue contained a 10 percent interest provision while charging Sac EDM for 30 percent under those agreements. Furthermore, he misrepresented the duration of the lease agreements at 60 months when, by their operation, the leases were set to last at least 102 months.

As discussed above, not only did Hynes misrepresent those terms, but also they were unconscionable under the circumstances. "If the court as a matter of law finds a lease contract or any clause of a lease contract to have been unconscionable at the time it was made the court may refuse to enforce the lease contract, or it may enforce the remainder of the lease contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Mo. Rev. Stat. § 400.2A-108; see also id. § 400.2-302. In exercising this discretion, the court finds it appropriate to limit the clauses of the lease agreements it determines to be unconscionable in order to reflect plaintiffs' understanding of what those agreements were to entail absent Hynes' fraudulent breach of his duty of loyalty. In particular, the court finds it appropriate to limit the 30 percent interest term on each of the leases to the initial 10 percent that Hynes had represented when the parties entered into each of those agreements. The court also finds it suitable to limit the duration term of those contracts to reflect Hynes' representation that the leases would terminate after 60 months, and that Sac EDM would have the option to purchase the leased equipment at the end of that term.[42]

In order to receive the benefit of the bargain under the terms of the leases absent Hynes' fraudulent breach of duty, Sac EDM is entitled to recover any payments made under the leases on surcharges exceeding the 10 percent and, as discussed below with regard to defendants' breach of contract counterclaim regarding the equipment leases, is only liable for damages for its later breach of those written contracts to the extent permitted by the terms of those agreements as they have been limited by the court.[43]

////

////

---

[42] This means that the court also limits the term from the leases permitting Sac EDM to apply 50 percent of its lease payments towards an option to buy out the leased equipment to a term giving Sac EDM the option to purchase the equipment upon payment of 60 full monthly payments under the revised monthly payment calculation set forth above.

[43] Plaintiffs fail to demonstrate that Dan Folk individually suffered damages resulting from Hynes' fraudulent breach of fiduciary duty as the evidence demonstrates that each payment on the leases was made by Sac EDM.

Furthermore, as discussed in further detail below with regard to Hynes' and HAI's counterclaims concerning the equipment leases, HAI assigned its rights as lessor under equipment leases one through nine to Hynes Children effective January of 2005, and replaced Sac EDM as lessee under those leases.[44]  The terms of those leases expressly forbid the named lessee from subleasing the equipment governed by those agreements.  Nevertheless, HAI improperly continued to bill Sac EDM monthly for payments under those leases.  (Exhs. 277, 363.) Accordingly, the court concludes that Sac EDM is entitled to restitution from HAI for the entirety of any payments it made to HAI for equipment leases one through nine beginning in January of 2005.

In sum, the court concludes that Sac EDM is entitled to $413,151.00 in restitution from HAI[45] for the unjust gains it realized from Hynes' fraudulent breach of fiduciary duty with regard to the equipment leases.[46]

---

[44] Although Hynes Children subsequently attempted to assign its rights as lessor under leases one through nine back to HAI on December 31, 2008, that attempted assignment was without legal effect for the reasons discussed below with regard to Hynes' and HAI's counterclaims.

[45] While HAI assigned its rights as lessor under leases one through nine to Hynes Children and assumed the role as lessee under those agreements beginning in January of 2005, the evidence demonstrates that HAI continued to bill Sac EDM for the full monthly lease payments despite lacking authority to do so under the terms of those leases.  (Exhs. 1, 363.)  Accordingly, the court concludes that HAI is the defendant that was unjustly enriched by Hynes' fraudulent breaches of his fiduciary duty concerning those leases.

[46] For purposes of restitution concerning any payments made to HAI under the first nine lease agreements in January of 2005 and beyond, the court totals all such payments, as evidenced by Joint Exhibit 363.  With regard to leases 10 through 20, and any payments on the first nine leases made to HAI prior to 2005, the court calculates the restitution figure by first taking the amount it finds defendants paid to purchase each piece of equipment, dividing that price for each piece by 60 (based on the duration of the lease) and then adding 10 percent to that amount for interest. The court then takes the amount derived from that calculation and subtracts it from the amount the credible evidence shows Sac EDM paid each month to lease each piece of equipment.  If the remaining amount for a given month is greater than zero, then the court adds that amount to the total restitution calculation; if that amount is either zero or negative (for months when Sac EDM paid less than one-sixtieth of the purchase price plus 10 percent), then the court does not include that amount in the total restitution calculation.  The court rounds the difference for each month to the nearest whole dollar (i.e., 50 cents and greater is rounded up to the nearest whole dollar, and anything less than 50 cents is rounded down to the nearest whole dollar).  In determining the price paid for each piece of equipment and the amount of each monthly lease payment Sac EDM made

With regard to the US Banc judgment, defendants argue that plaintiffs fail to satisfy the benefit of the bargain standard through the relief they seek because absent Hynes' breach of his fiduciary duty and commission of constructive fraud in having plaintiffs agree to the terms of the January 21, 2005 writing, plaintiffs would have still faced a deficiency judgment held by US Banc in the full principal amount of $283,473.77. However, this argument ignores the fact that there existed a prior agreement between HAI, acting through Hynes, and the Folks whereby the Folks would pay back the $50,000 HAI paid to purchase the stipulated judgment from US Banc plus interest in full satisfaction of that liability. By inducing Dan Folk to enter into the second agreement both on his own behalf and Sac EDM's behalf after the first agreement was in place in what amounted to a fraudulent breach of his duty of loyalty, Hynes denied plaintiffs the benefit of the first bargain, which was that the US Banc judgment would be deemed satisfied in full after the Folks paid the $50,000 plus interest to HAI on Sac EDM's behalf.

The evidence presented at trial demonstrates that the Folks paid off the entirety of the $50,000 plus interest obligation in August of 2005 using proceeds obtained from the sale of their personal home. If not for Hynes' actions in breach of his fiduciary duties owed to plaintiffs that led plaintiffs to enter into the second agreement, Sac EDM would not have been obligated to pay the entirety of the US Banc judgment, and Dan Folk would not have been held to personally guarantee those payments. Absent Hynes' tortious conduct, plaintiffs would have been under no further obligation to make payments on the US Banc judgment after the Folks' August 2005 payment because defendants would have been obligated to deem it fully satisfied. Therefore, plaintiffs are entitled to receive the benefit of that bargain.

Accordingly, the court concludes that plaintiffs are entitled to declaratory relief finding that the entire balance of the US Banc judgment was fully satisfied in August of 2005 when the Folks paid $52,451.51 in full satisfaction of their payment obligations under the parties'

over the course of the parties' dealings, the court relies on the records contained in Joint Exhibit 363. For purposes of determining the purchase price of leases 10 through 20, the court relies on the "cost" value for each of those leases contained in Joint Exhibit 363. This calculation does not take into account any payments made with regard to lease number 14, for which the evidence demonstrates Sac EDM paid $22,770 to HAI in full satisfaction of its payment obligations under that agreement.

agreement that was in place prior to Hynes' fraudulent breach of his fiduciary duty.  In

furtherance of this declaration, whichever defendant (or defendants) currently holds the right to

enforce the US Banc judgment shall file a Satisfaction of Judgment form in Sacramento County

Superior Court case number 04AS03050.  Furthermore, defendants are enjoined from selling,

transferring, or otherwise alienating any interest they may have with regard to that judgment.[47]

Additionally, Sac EDM is entitled to restitution from HAI and Hynes Children for the

payments it has made towards that judgment since January 31, 2006, when it first began to make

such payments.  The credible evidence presented at trial demonstrates that Sac EDM's payments

to HAI and Hynes Children towards the US Banc judgment between January 31, 2006, and March

31, 2010, amounted to $251,000.  $162,000 of this amount was paid to Hynes Children while it

held the note to the judgment between January 31, 2006, and December 31, 2007.  The remaining

$89,000 was paid to HAI between January 31, 2008, and March 31, 2010.  Accordingly, the court

concludes that Sac EDM is entitled to restitution in the amount of $162,000 from Hynes Children,

and $89,000 from HAI based upon the unjust profits those defendants reaped from Hynes'

fraudulent breach of his fiduciary duty of loyalty to Sac EDM with regard to the parties' dealings

concerning the US Banc judgment.[48]

Plaintiffs also seek damages for the entire amount that Hynes was paid in consulting fees

over the course of the OK EDM joint venture, from January of 2004 through July of 2009.

However, plaintiffs fail to prove that their remittance of Hynes' consulting fees over the course of

the parties' business relationship was improperly caused by Hynes' fraudulent breaches.  In other

words, just because Hynes advised plaintiffs in several instances in breach of his fiduciary duties

to them does not mean that plaintiffs are entitled to recoup all of the fees they agreed to pay him

for his consulting services pursuant to the parties' business plan and other agreements.  A

preponderance of the evidence shows that Hynes assisted Sac EDM and Dan Folk in their

[47] Because the court declares the US Banc judgment fully satisfied and enjoins defendants from
enforcing that judgment, it declines to address plaintiffs' additional argument that defendants
cannot collect on that judgment pursuant to California Corporations Code § 2105(a).

[48] The court calculates the amounts Sac EDM paid to HAI and Hynes Children towards the US
Banc judgment based on the figures included in Joint Exhibit 84.

business operations and regularly provided consulting services throughout the course of the parties' business relationship, and was paid for those services accordingly under the terms of the parties' business plan. Plaintiffs in no way demonstrate how Hynes' fraudulent breaches caused them to make payments to him in the form of consulting fees that they would not have made but for those instances of misconduct. Accordingly, the court concludes that plaintiffs cannot recover damages for the consulting fees they paid to Hynes during the course of the parties' business endeavors.

C.   Plaintiffs' Intentional and Negligent Interference with Prospective Business Advantage Claims

In their post-trial briefing, plaintiffs acknowledge that the evidence presented at trial fails to establish one or more of the necessary elements for their claims based on theories of intentional and negligent interference with prospective business advantage. Accordingly, plaintiffs request that the court dismiss those claims without prejudice. The court grants plaintiffs' request to dismiss their claims. However, the court declines to approve their additional request that those two claims be dismissed without prejudice. An entire seven-day trial on the merits of the parties' claims has been conducted in this action, and by plaintiffs' own admission they have failed to produce evidence that meets their burden in proving the necessary elements of those claims. Accordingly, plaintiffs' intentional and negligent interference with prospective business advantage claims are dismissed with prejudice.

D.   Hynes' and HAI's Counterclaims

Defendants Hynes and HAI assert counterclaims based on breach of contract for the amounts they claim plaintiffs owe on outstanding balances for the operating loans, equipment leases, and premiums on Dan Folk's and Hynes' life insurance policies.[49]

To prevail on a breach of contract claim under California law, the party asserting such a claim must prove the following elements: (1) the existence of a contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) damages to the

---

[49] Defendant Hynes Children is not named as a counterclaimant in the counter-complaint. (See ECF No. 87.)

plaintiff as a result of the breach. <u>CDF Firefighters v. Maldonado</u>, 158 Cal. App. 4th 1226, 1239 (2008). Similarly, for purposes of Hynes' and HAI's breach of contract claims relating to the equipment leases, to prove such a claim under Missouri law, the plaintiff "'must establish the existence of a valid contract, the rights of plaintiff and obligations of defendant under the contract, a breach by defendant, and damages resulting from the breach.'" <u>Gillis v. Principia Corp.</u>, 832 F.3d 865, 871 (8th Cir. 2016) (quoting <u>Lucero v. Curators of Univ. of Mo.</u>, 400 S.W.3d 1, 5 (Mo. Ct. App. 2013)).

1.   <u>Operating Loans</u>

The court finds that the initial business plan that Hynes signed on behalf of HAI and Dan Folk signed on behalf of Sac EDM on January 4, 2004, and the parties' subsequent amendments to that plan, including their July 19, 2008 partnership withdrawal plan, created a contract. Under that contract, HAI, acting under the trade name OK EDM, was to provide loans to Sac EDM over the course of each month either when Dan Folk, Geraldine Folk, or Shannon Gomez requested them, or when Hynes believed Sac EDM needed immediate operating capital, in order to cover Sac EDM's daily operating expenses. Pursuant to that contract, to the extent it operated prior to September 1, 2008, at the end of each month, Sac EDM could seek reimbursement from HAI d/b/a/ OK EDM, for the full amount of the operating expenses it had incurred over the course of that month. Sac EDM could use that reimbursement to repay HAI for any outstanding operating loans, but was not required to apply the reimbursement money to those loans. Ideally, under the parties' plan, Sac EDM would be able to pay off all of the operating loans HAI advanced over the course of a given month using its end of month reimbursement from OK EDM. However, a preponderance of the evidence demonstrates that Sac EDM did not always use its monthly reimbursement to pay off those loans, which caused the outstanding loan balance to accumulate over the course of the parties' business relationship.[50] Under the terms of the parties' business plan, Sac EDM was obligated to repay any operating loans HAI advanced at an interest rate of 9.5

---

[50] Indeed, the court finds that, at times, Dan Folk used portions of the operating loans extended to Sac EDM for personal purposes that could not be reimbursed pursuant to the parties' business agreement by having Sac EDM provide him with interest free loans, thereby steadily increasing the outstanding balance Sac EDM owed on the loans over time.

percent per annum. When Sac EDM stopped making further payments towards the outstanding loan balance on July 31, 2012, Sac EDM breached that payment obligation. Accordingly, the court finds that HAI is entitled to recover against Sac EDM for any unpaid amounts on the operating loans it provided to Sac EDM over the course of the OK EDM joint venture and beyond.

Based on a preponderance of the evidence that the court finds credible, the court concludes that the unpaid operating loans amounted to a principal balance of $516,777.35 as of July 31, 2012, the date Sac EDM stopped making payments.[51] The contract under which such operating loans were extended, i.e., the parties' business plans regarding the OK EDM joint venture and their withdrawal plan, provides for interest at 9.5 percent per annum, compounded daily. Accordingly, as of the date of this judgment, the total outstanding amount of principal and interest on the operating loans to Sac EDM is $808,746.36.

Hynes and HAI assert that Sac EDM and Dan Folk should be held jointly and severally liable for any damages for breach of the operating loan contract based on two alternative theories. First, they argue that the existence of the OK EDM joint venture meant that the actions of Dan Folk, as controlling owner of Sac EDM, were also attributable to Sac EDM, and vice versa. Second, they argue that the evidence shows that Sac EDM operated as an alter ego of Dan Folk, therefore making Dan Folk liable for any debts Sac EDM incurred. The court finds both arguments unavailing.

With regard to joint liability based on the OK EDM joint venture, the evidence demonstrates that the parties formally withdrew from that business relationship as of September 1, 2008, via a signed writing on July 19, 2008. While that agreement still provided that HAI would continue to extend operating loans to Sac EDM, it also terminated Sac EDM's status as a vendor to HAI, meaning that Sac EDM would no longer route its income to HAI d/b/a OK EDM, and HAI would no longer reimburse Sac EDM for its monthly operating expenses. From

---

[51] The court derives this amount from the parties' Joint Exhibit 289, which is a recapitulation of the balance of payments on the operation loans from January 1, 2005, through July 31, 2012, and appears to have been prepared on behalf of Sac EDM by someone other than Hynes on November 6, 2012.

September 1, 2008 onward, Sac EDM's relationship with HAI and the other defendants was more in the nature of a lender-borrower relationship, rather than one of partnership. Accordingly, the court concludes that when Sac EDM stopped making payments on the loan balance on July 31, 2012, it did so outside the bounds of the partnership on which Hynes and HAI premise their argument.

With regard to Hynes and HAI's argument under the alter ego doctrine, the court concludes that defendants presented insufficient evidence to support the application of that doctrine to Dan Folk and Sac EDM. While Hynes testified at trial that, at times, he considered Sac EDM, the corporation, Dan Folk, the individual, and Sac EDM SP, the sole proprietorship, as largely one and the same, and while some evidence indicates that Dan Folk, at times, took out interest free loans from Sac EDM, the parties' accounting and tax records presented at trial demonstrate that Sac EDM operations were sufficiently separate from Dan Folk as an individual such that the alter ego doctrine is not applicable. Accordingly, the court concludes that defendants fail to meet their burden in proving that Sac EDM operated as the alter ego of Dan Folk.

HAI and Hynes fail to persuasively demonstrate that Dan Folk should be held jointly liable for Sac EDM's breach of its payment obligation with regard to the operating loans. Accordingly, the court concludes that only Sac EDM is liable for the $808,746.36 in damages caused by its breach of its contract with HAI regarding the repayment of the operating loans that defendant extended to it under the terms of the parties' business plans that were in operation over the course of the parties' business relationship.

## 2. Leases

As an initial matter, the court finds by a preponderance of the evidence that neither Hynes nor HAI can enforce any of the first nine equipment leases at issue, which consist of the items identified in the eight attachments to the first master lease dated August 1, 2004, and the items identified as the "Tom White" equipment that was subsequently leased under the terms of that same master lease. While the master lease agreement for these leases was signed by Dan Folk on behalf of Sac EDM as lessee, and Hynes on behalf of Hynes Children as lessor, each of the

equipment leases themselves provided that HAI "d/b/a OK EDM and Waterjet and/or SacEDM & Waterjet" was the lessee with regard to the specific equipment leased under those agreements. (Exhs. 1, 277; Tr. 1337-38.)  During trial, Hynes testified that HAI "d/b/a OK EDM and Waterjet and/or SacEDM & Waterjet" was one of "two divisions" of HAI itself, acting as the trade name for its California operations, for which Dan Folk and Sac EDM acted as a vendor, while the other division was the consulting and aircraft leasing arm of HAI.  (Tr. 1325.)  By January of 2005, HAI had transferred any interest it had in the leases under the master lease agreement to Hynes Children and assumed the role of lessee under that agreement.[52]  Hynes arranged to have HAI act as lessee under the equipment leases in place of Sac EDM after Hynes Children took over as lessor because Hynes Children's board of directors wanted to be able to hold Hynes and HAI responsible for any payments due under the leases, instead of Sac EDM, with which the Hynes Children's board of directors was unfamiliar.  (Tr. 1555-58.)  Despite arranging the parties to these leases in such a fashion, defendants still intended for Sac EDM to receive the beneficial use of the equipment subject to those agreements.  (Id.)  Accordingly, the court finds upon a preponderance of the evidence that each of these nine leased items were actually between Hynes Children as lessor and HAI, under its trade name "OK EDM and Waterjet and/or SacEDM & Waterjet," as lessee, not Sac EDM, which was a separate corporate entity, and was merely a third party beneficiary under the agreement.[53]

---

[52] As noted above with regard to the findings of fact, the court finds that the parties subsequently backdated each lease to which Hynes Children was lessor and HAI d/b/a OK EDM was lessee to October 1, 2004.

[53] The court acknowledges that these contracts could arguably be construed as having been between Hynes Children as lessor and Hynes and Dan Folk personally as partners in OK EDM given the fact that Dan Folk also signed each attachment under the lessee heading and the name of the lessee included "SacEDM & Waterjet," Dan Folk's sole proprietorship, as one of the trade names HAI used under these leases.  However, any uncertainty in a contract must be construed against its drafter.  Marion v. Hazelwood Farms Bakeries, Inc., 969 F. Supp. 540, 543 (E.D. Mo. 1997) ("It is well settled under Missouri law that ambiguities in a contract are construed against the drafter.");  see also Stanislaus Towing & Recovery Servs., Inc. v. City of Modesto, 2012 WL 1898917, at *7 (E.D. Cal. May 23, 2012) (quoting Roth v. Department of Veterans Affairs, 110 Cal. App. 3d 622, 628 (1980)).  Here, Hynes drafted all of the parties' equipment leases and their attachments for each piece of equipment leased pursuant to those agreements.  Accordingly, the

68

While Hynes Children attempted to assign to HAI all its rights under the leases at issue to which it was named lessor and to which Sac EDM and/or Dan Folk was named as lessee, the language of that assignment had no effect of legal assignment with regard to these equipment leases because the lessee was HAI d/b/a OK EDM, not Sac EDM. (Exh. 363.) Moreover, to the extent defendants argue that HAI subleased to Sac EDM any equipment Hynes Children leased to it, the terms of the lease agreement itself demonstrate that such a sublease is unenforceable. The terms of the master lease expressly prevent the lessee from subleasing any equipment subject to that agreement. (Exh. 1.) Finally, defendants cannot seek to enforce those contracts on Hynes Children's behalf because that defendant is not named as a party to the counter-complaint.

In short, a preponderance of the credible evidence demonstrates that the leases are unenforceable against Sac EDM as it is not the lessee under those agreements, but rather a third party beneficiary with no payment obligations under the terms of those contracts. It demonstrates further that, in any event, neither defendant asserting counterclaims in this action is the lessor under any of the nine lease agreements, therefore meaning they have no right to damages for any failure to pay under those agreements.

Hynes and HAI argue that they are nonetheless entitled to any unpaid amounts on the leases they seek through their counterclaims, even in the event that no contract was formed between either one or both of them and Sac EDM, based on the equitable theories of promissory estoppel and/or equitable estoppel. The court finds those arguments unconvincing.

First, a party may recover in equity under a theory of promissory estoppel only when it can prove that it relied on a promise to its detriment that would be otherwise unenforceable as a contract for lack of consideration. See Barroso v. Ocwen Loan Servicing, LLC, 208 Cal. App. 4th 1001 (2012). Here, the court finds that a valid lease contract was established between Hynes Children, as lessor, and HAI, as lessee, with Sac EDM in the role of third party beneficiary. Consideration was present, because HAI agreed to make monthly payments in exchange for Hynes Children's agreement to allow Sac EDM to use the equipment it owned in Sac EDM's

court finds it appropriate to construe these equipment leases against its drafter as having been between Hynes Children as lessor and HAI as lessee.

69

operations on behalf of the OK EDM joint venture. Furthermore, the terms of the lease agreements demonstrate that the promise to make monthly payments that Hynes and HAI seek to enforce through their counterclaims was made by HAI, not Sac EDM. Accordingly, the court concludes that Hynes and HAI cannot recover for any non-payment under these nine leases through a claim of promissory estoppel.[54]

Hynes and HAI also cannot recover under a claim of equitable estoppel. "'[The doctrine of equitable estoppel] provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.'" City of Goleta v. Superior Court, 40 Cal.4th 270, 279 (2006) (quoting City of Long Beach v. Mansell, 3 Cal. 3d 462, 488 (1970)). "The 'gravamen' of [equitable] estoppel is a misleading representation by the plaintiff that the defendant relies on to his detriment." Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962 (2014).

Here, the court finds that defendants have not met their burden in proving that Dan Folk or someone else at Sac EDM made a misleading representation to either HAI or Hynes regarding the nine leases. To the contrary, the evidence demonstrates that Hynes, acting on behalf of all defendants, was well aware of the true state of facts because he was the one who drafted the lease contracts with the intent that Hynes Children would be the lessor and HAI, not Sac EDM, the lessee.[55] Accordingly, the court concludes that neither Hynes nor HAI can recover against plaintiffs with regard to the first nine leases under the two estoppel theories they advance in their post-trial briefing.

---

[54] If anything, Hynes Children, as lessor, could seek damages for breach of contract against HAI, as lessee, for any non-payment under these leases.

[55] Hynes was also the one who included the term in the master lease agreement for these nine leases that restricted the lessee from subleasing the equipment, thereby preventing HAI from entering a valid sublease with Sac EDM regarding the equipment.

Nevertheless, the preponderance of the evidence shows that the 11 other equipment leases at issue, leases 10 through 20, are enforceable contracts to the extent that the terms of those agreements have been limited by the court. The evidence demonstrates that each agreement was in writing and signed by Dan Folk on behalf of Sac EDM and Hynes on behalf of HAI, and clearly sets forth key terms such as the particular equipment subject to those leases and the monthly lease rates. (Exhs. 2, 3.) The evidence also shows that HAI performed its duties under those agreements by allowing Sac EDM to use the leased equipment to operate its business without interruption. Under the reformed terms of those agreements discussed above, Sac EDM was obligated to make monthly payments that were calculated by taking the price the lessor paid to purchase the leased equipment divided by 60 (based on the months of the lease term), plus an additional 10 percent on top of that amount. Sac EDM was obligated to make such monthly payments for a total of 60 months, at which time it would be entitled to exercise its option to purchase the leased equipment.

Sac EDM defaulted on these 11 leases when it decided to stop making monthly payments on each of them. See Mo. Rev. Stat. § 400.2 A-523 (a lessee is considered to be in default if the lessee fails to make a payment when due or repudiates its obligations with respect to a part or the whole lease contract). Defendants correctly argue that HAI, as lessor, is entitled to recover any unpaid rent it is owed under the terms of these leases based on Sac EDM's default. See id. 400.2A-529 (providing that a lessor is entitled to remedy a default where the leased items have not been repossessed by recovering any "accrued and unpaid rent as of the date of entry of judgment"). Because the court has limited the duration term of each equipment lease to 60 months and more than 60 months have passed between the initiation of Sac EDM's payments and the date of this judgment with regard to each of the leases at issue, the court concludes that HAI is entitled to damages in the amount of the entire 60 months' worth of full payments under each lease, as limited by the court, minus any payments the evidence demonstrates Sac EDM made towards each lease.[56] Accordingly, HAI is entitled to damages amounting to $70,930 based on

_____

[56] In other words, damages are calculated for each lease using the following formula: (60 x [(cost / 60) +10 percent]) – amounts Sac EDM paid under the lease.

Sac EDM's default under equipment lease numbers 10 through 20.[57]

### 3. Insurance Premium Payments

Finally, defendants argue that Sac EDM breached a contractual obligation owed to HAI to repay the amounts HAI invoiced to Sac EDM for premiums HAI paid for the life insurance policies it took out on both Dan Folk and Hynes.

The evidence proffered at trial demonstrates that Dan Folk and Hynes signed a writing on March 28, 2007, amending the parties' business plan to include a provision that "key man" life insurance policies were to be taken out on both Dan Folk and Hynes moving forward, and that Sac EDM would ultimately be responsible for paying the premiums under both policies. (ECF No. 64.) The court finds that this document constitutes a valid written contract between HAI and Sac EDM whereby HAI would bill Sac EDM each month to cover the premiums it owed under each policy. The preponderance of the evidence shows further that the combined premiums on both policies were $1,900 per month, which HAI billed to Sac EDM on a monthly basis. Sac EDM breached that agreement when it began to make only partial payments of $50 each month beginning in March of 2009, and later when it stopped making payments altogether in July of 2011. HAI suffered damages as a result of this breach by having to continue to pay the premiums under both policies without reimbursement from Sac EDM as the parties' agreement had envisioned.

While plaintiffs contend that HAI was the beneficiary under both policies and that the premiums for the policy taken out on Hynes' life were much larger than those for the policy on Dan Folk's life, they present no credible evidence that such terms were unconscionable under the circumstances. With regard to the fact that HAI was the beneficiary under the agreement, the agreement itself sets forth a legitimate purpose for such an arrangement. In the event of either insured's death, the proceeds would go to HAI in full satisfaction of the outstanding operating

---

[57] The court notes that after Sac EDM pays HAI for the outstanding lease balance calculated above, it is entitled to exercise its option to purchase all of the equipment under leases 10 through 20 pursuant to these leases' buyout term, as that term has been limited by the court (i.e., Sac EDM can exercise its option to purchase the leased equipment after making the equivalent of 60 full monthly payments). Specifically, once Sac EDM pays the amounts owed for the leases set forth herein, it owns the equipment outright.

debts Sac EDM owed.  The evidence shows that the purpose of the two policies was to allow Sac EDM to easily pay off its outstanding operating debts to defendants and the parties to wind down their partnership in the event of either Dan Folk's or Hynes' death.  It was reasonable for the parties to have named HAI as the beneficiary in furtherance of fulfilling that purpose.  With regard to the relative prices of the two policies, a preponderance of the evidence introduced at trial demonstrates that Hynes' policy premiums were much larger than those associated with Dan Folk's policy due to Hynes' advanced age.  Accordingly, plaintiffs fail to put forth credible evidence demonstrating that the premiums on either policy at issue were excessive under the circumstances.

With regard to damages, defendants contend that the evidence shows that Sac EDM only made payments of $50 starting in March of 2009, and stopped making payments altogether beginning in August of 2011.  Therefore, defendants contend that Sac EDM is liable for $1,850 per month ($1900 minus the $50 actually paid) for the period from March 2009 through July 2011, and $1900 per month thereafter.[58]  Defendants assert that the unpaid premiums continue to accrue to this date, and that the outstanding payments should be calculated through the date of judgment.  The court agrees with defendants' assessment of the damages.

A preponderance of the evidence shows that HAI invoiced Sac EDM $1,900 per month beginning in October of 2007 for payment of the premiums on the two policies.  It also shows that Sac EDM paid only $50 per month towards the premium payments that HAI invoiced from March of 2009 through July of 2011, and stopped paying altogether beginning in August of 2011.  HAI has continued to pay those premiums through the present day.  Accordingly, the court finds Sac EDM liable in the amount of $184,750.00 for the breach of its contract with HAI regarding the payment of the premiums for the life insurance policies taken out on the lives of Dan Folk and Hynes.[59]

---

[58] Defendants contend that this amounts to a total principal amount of $177,150 plus pre-judgment interest as of December 2016.

[59] The court calculates this total by multiplying $1850 ($1900 payment due – $50 Sac EDM paid) by 29, for each of the 29 months Sac EDM paid only $50 per month towards the life insurance premiums, and then adding that total to $1900 multiplied by 69, for each of the months since Sac

IV. Conclusion

Based on the findings of fact and conclusions of law contained herein, IT IS HEREBY ORDERED that:

1. Based on the court's conclusion that Hynes, while acting on behalf of HAI and Hynes Children, breached his fiduciary duties owed to both plaintiffs and committed constructive fraud through his misrepresentations in connection with the equipment lease contracts and the parties' agreement regarding the repayment of the US Banc judgment, the court finds that plaintiffs are entitled to the following relief:

a. Sac EDM is entitled to $413,151.00 in restitution against HAI for the unjust gains it realized from Hynes' fraudulent breach of fiduciary duty with regard to the equipment leases. [60]

b. Sac EDM is entitled to restitution in the amount of $162,000.00 from Hynes Children, and $89,000.00 from HAI based on the unjust profits those defendants reaped from Hynes' fraudulent breach of his fiduciary duty of loyalty to Sac EDM with regard to the parties' dealings concerning the US Banc judgment.

c. The court declares that the entire balance of the US Banc judgment was fully satisfied as to both plaintiffs in August of 2005 when Dan and Geraldine Folk paid $52,451.51 in full satisfaction of their payment obligations under the parties' agreement that was in place prior to Hynes' fraudulent breach of his fiduciary duty. In furtherance of this declaration, whichever defendant (or defendants) currently holds the right to enforce the US Banc judgment shall file a Satisfaction of Judgment form in Sacramento County Superior Court case number 04AS03050 forthwith. Furthermore, defendants are permanently enjoined from selling,

_____

EDM altogether stopped making monthly payments towards the monthly premiums through the date of this judgment.

[60] While HAI assigned its rights as lessor under leases one through nine to Hynes Children and assumed the role as lessee under those agreements beginning in January of 2005, the evidence demonstrates that HAI continued to bill Sac EDM for the full monthly lease payments despite lacking authority to do so under the terms of those leases. (Exhs. 1, 363.) Accordingly, the court concludes that HAI is the defendant that was unjustly enriched by Hynes' fraudulent breaches of his fiduciary duty concerning those leases.

74

transferring, or otherwise alienating any interest they may have with regard to the US Banc judgment.

   2.   Based on the court's conclusion that Sac EDM breached its contractual obligations to HAI to make monthly payments on the remaining balance of the operating loans HAI had extended to it over the course of the parties' business dealings, under the equipment lease contracts under which HAI was lessor and Sac EDM was lessee, and under its agreement to reimburse HAI for the monthly payments HAI made towards the premiums on Dan Folk's and Hynes' life insurance policies, the court finds that HAI is entitled to the following relief against Sac EDM:

   a.   Damages amounting to $808,746.36 based on Sac EDM's breach of contract with regard to the operating loans HAI had extended to it.

   b.   Damages amounting to $70,930.00 based on Sac EDM's default under equipment leases 10 through 20.

   c.   Damages amounting to $184,750.00 based on Sac EDM's breach of its contract with HAI regarding the payment of the premiums for the life insurance policies taken out on the lives of Dan Folk and Hynes.

   3.   The parties are to bear their own attorneys' fees and costs.

   4.   The Clerk of Court is directed to enter final judgment in this action in accordance with the above findings of fact and conclusions of law.

   5.   The Clerk of Court is directed to close this case.

   IT IS SO ORDERED.

Dated:  April 18, 2017

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

75